**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

CRYSTAL CERVANTEZ-TKAC, individually and as sole member of Simaya Innovations LLC, and SIMAYA INNOVATIONS LLC, a Colorado limited liability company, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

VAN LAURENCE BARKER;
JOSHUA JAMES KENNEDY;
SIYUAN ZHENG;
LIGHTHOUSE ESTATES LLC; and
STARPOINT HOLDINGS LLC,

Defendants.

Case No. 3:26-cv-280-CHB

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

# CLASS ACTION COMPLAINT

LOFTUS & EISENBERG, LTD.
Alexander N. Loftus, Esq. (Pro Hac Vice Pending)
181 W. Madison Street, Suite 4700
Chicago, Illinois 60602
(312) 899-6625
alex@loftusandeisenberg.com

MICHELE HENRY LAW, P.C.
Michele Henry, Esq.
517 W Ormsby Ave,
Louisville, KY 40203
502.536.0085
mhenry@michelehenrylaw.com
*Counsel for Plaintiffs and the Proposed Class*

# TABLE OF CONTENTS


I. NATURE OF THE ACTION .......... 1
II. PARTIES .......... 4
III. JURISDICTION AND VENUE .......... 15
IV. THE PML NOTES ARE SECURITIES UNDER KENTUCKY LAW .......... 17
V. FACTUAL ALLEGATIONS .......... 24
VI. CLASS ACTION ALLEGATIONS .......... 43
VII. STATUTE OF LIMITATIONS AND FRAUDULENT CONCEALMENT .......... 48
VIII. CLAIMS FOR RELIEF .......... 52
COUNT I: Violation of KRS 292.480(1) .......... 52
COUNT II: Violation of KRS 292.340 .......... 55
COUNT III: Control Person and Secondary Liability .......... 56
COUNT IV: Common Law Fraud .......... 61
COUNT V: Unjust Enrichment .......... 64
COUNT VI: Breach of Contract .......... 67
IX. REQUEST FOR APPOINTMENT OF RECEIVER .......... 71
X. PRAYER FOR RELIEF .......... 76
XI. JURY DEMAND .......... 78

Plaintiffs Crystal Cervantez-Tkac ("Tkac"), individually and as sole member of Simaya Innovations LLC ("Simaya"), and Simaya Innovations LLC, a Colorado limited liability company (collectively, "Plaintiffs"), by and through their undersigned counsel, individually and on behalf of others similarly situated, bring this action for damages and equitable relief against Van Laurence Barker ("Barker"), Joshua James Kennedy ("Kennedy"), Siyuan Zheng ("Zheng"), Lighthouse Estates LLC ("Lighthouse"), and Starpoint Holdings LLC ("Starpoint") (collectively, "Defendants") and state as follows:

## I. NATURE OF THE ACTION

1. Plaintiffs, on behalf of themselves and all others similarly situated, bring this class action against Defendants for violations of the Kentucky Securities Act, KRS Chapter 292, and common law fraud, arising from a Ponzi scheme operated through Lighthouse and affiliated entities. Plaintiffs also seek the appointment of an equity receiver over Lighthouse Estates LLC, Starpoint Holdings LLC, and all assets of Van Laurence Barker personally, to preserve those assets for the benefit of the defrauded class.

2. This case concerns an elaborate scheme through which Defendant Van Laurence Barker ("Barker"), together with his family members, business associates, and affiliated entities, solicited at least $26 million from more than 125 private money lenders ("PMLs") across the United States to fund purported real estate investments. Defendants promised PMLs fixed returns of 15% to 19% on short-term promissory notes — typically 15% flat over six months in the earlier transactions and 19% flat over three months in later transactions — representing that their funds would be used to purchase and rehabilitate residential properties, which would then be refinanced for a profit. In reality, Defendants operated a Ponzi scheme: they used new investor funds to pay

existing investors, performed little or no rehabilitation on the properties, recycled the same properties through repeated transactions to generate the appearance of legitimate deal flow, and diverted investor funds to personal use and to affiliated entities controlled by Barker and his family.

3. Barker admitted the scheme in his own words. At a recorded meeting in October 2025, Barker stated: "we basically do refreshes of the loan by swapping out private lenders." He explained that "deal recycling work is really you’re just taking money and funding cash to close. So it’s a form of stake lending." He admitted that Lighthouse performed no rehabilitation: "we don’t do really any refurb." And he acknowledged that normal safeguards had been eliminated: "No ground-level causes that restrict our ability to serve as that exit strategy. There’s not an appraisal."

4. At a January 2026 meeting between PML representatives and the principals of Kentucky Private Lending LLC ("KPL"), a senior hard-money lender with approximately $30 million of secured exposure on Lighthouse properties whose positions PMLs were routinely used to retire, KPL manager Aaron Metten admitted that the Lighthouse portfolio was “underwater,” with approximately $60 million in debt against properties worth “30 to 50 cents on every dollar for the loan value.” Metten confirmed that Lighthouse was not current on its interest payments to PMLs and estimated a “60% loss if we sold everything as is.” Metten confirmed there were approximately 270 properties on the books.

5. Kennedy, Barker’s senior associate and a member of Starpoint Holdings LLC, admitted at the same meeting that he “helped van Barker establish this business back in late 2023” and that “it led to a system being created where funds were being rolled over.” Kennedy acknowledged that “the rehab Fund started being used to... keep pay back a note, and then keep

notes going forward. A Swap System of sorts was developed.” Kennedy admitted that "whatever system we were doing, there was... no runway to keep it going much longer."

6. In a separate January 2026 Zoom call, Lighthouse representatives acknowledged that their business model involved cycling private money lenders in and out, and that the "model had fallen apart due to not enough cash or liquidity." They stated there was "no remaining financial runway to sustain operations, as liquidity had been exhausted once new investor funds stopped coming in." Kennedy signed a letter to investors in which he admitted that "a temporary system evolved where KPL and PML loans were effectively recycled internally," that the system "only works when inflows remain uninterrupted," and that "the model became unsustainable."

7. The scheme has left at least 125 PMLs holding worthless or near-worthless promissory notes secured by properties that, by Defendants’ own admissions, are worth a fraction of the outstanding loan balances. At least 270 properties are on the books, with total outstanding debt of approximately $60 million against assets that Defendants’ own representatives value at $30 million to $51 million at best, and far less if sold in current condition. The class has suffered losses estimated at $24 million or more.

8. The consequences have been devastating. Families have lost life savings, retirement and IRA funds have been wiped out, businesses have collapsed, and many victims are now facing severe financial hardship—taking on multiple jobs, unable to pay rent or mortgages, and forced to abandon livelihoods built over decades.

9. Barker is now incarcerated. On December 19, 2025, Barker was arrested by the FBI and, following a detention hearing, was ordered held without bond pending trial on federal criminal charges including attempted online enticement of a minor in violation of 18 U.S.C. § 2422(b) and distribution of child sexual abuse material in violation of 18 U.S.C. § 2252A(a)(2).

10. Barker's incarceration removes the principal architect of the scheme from day-to-day control of Lighthouse, Starpoint, and the affiliated entities, heightens the risk of uncontrolled asset dissipation by surrogates and family members, and independently supports the appointment of a receiver to preserve class assets.

11. Plaintiffs bring this action to recover those losses, to hold each Defendant accountable for its role in the scheme, and to obtain the appointment of an equity receiver over Lighthouse Estates LLC, Starpoint Holdings LLC, and all assets of Barker personally — the principal who conceived and directed the scheme and who has demonstrated a pattern of diverting scheme proceeds to personal use, offshore entities, and family-controlled vehicles — to prevent further dissipation and maximize recovery for the class.

## II. PARTIES

### A. Plaintiffs

12. Plaintiff Crystal Cervantez-Tkac ("Tkac") is a natural person and citizen of the State of Colorado, residing in Denver County, Colorado. Tkac is the sole member and manager of Simaya Innovations LLC. Tkac funded Simaya's investments with personal savings, including life insurance proceeds received following her husband's death in 2024.

13. Plaintiff Simaya Innovations LLC ("Simaya") is a Colorado limited liability company whose sole member and manager is Crystal Cervantez-Tkac. Simaya is the entity through which Tkac made all PML investments at issue in this action. Simaya is the party to the joint venture agreements, funding agreements, and promissory notes that constitute the securities described in this Complaint. Simaya has direct standing as the contracting party and the entity whose capital was invested and lost.

14. Between February and November 2025, Simaya invested a total of $365,000 in capital across four separate PML transactions in properties associated with Lighthouse Estates and its affiliated entities, as follows:

a. 1941 W. 10th Place, Gary, Indiana 46404: $105,000 investment under a joint venture agreement dated February 25, 2025, with a maturity date of August 24, 2025. The borrower was Lighthouse Estates LLC. Kennedy signed the personal guarantee on this property. This investment was nominally "repaid" in October 2025 in the amount of $112,787.50 (paid in direct deposits from a Lighthouse-controlled account followed by a final payment through title) — but the repayment was funded by recycling new investor capital from Neelema Sinha, a subsequent PML investor whose funds were used to pay off Simaya's note on this property. This transaction is a textbook example of the Ponzi mechanics at the heart of the scheme: Defendants used new investor money to create the illusion that prior investments were performing.

b. 1156 Van Buren Street, Gary, Indiana 46407: $95,000 investment. Simaya initially funded $45,000 under a funding agreement dated August 8, 2025 (attached as Exhibit "A", 1156 Van Buren Funding Agreement), which was increased to $95,000 by addendum effective August 22, 2025 (attached as Exhibit "B", 1156 Van Buren Funding Agreement Addendum). The borrower on this transaction was CeeKou LLC, a Wyoming limited liability company whose members are Siyuan Zheng (81%) and Lighthouse Estates LLC (19%) — not Lighthouse Estates LLC. The promissory note (attached as Exhibit "C", 1156 Van Buren Promissory Note) identifies CeeKou LLC as the borrower, but the signature block was executed by "Lighthouse Estates LLC, a Kentucky Limited Liability company by Van Barker," with Siyuan Zheng signing as "Duly Authorized Member." Barker signed the personal guarantee on behalf of Lighthouse Estates LLC (attached as Exhibit "D", 1156 Van Buren Personal Guarantee); Zheng co-signed the guarantee.

Simaya deposited the full $95,000, but $113,209.67 was paid to KPL as a loan payoff — meaning Simaya's funds were used to retire a prior KPL obligation rather than to acquire and rehabilitate the property. Zero payments have been made to Simaya.

c. 210 N. 26th Street, Louisville, Kentucky 40212: $65,000 investment under a joint venture agreement (attached as Exhibit "E", 210 N. 26th St., Louisville JV Agreement) with a maturity date of September 11, 2025. Simaya was the co-lender alongside Hidden Gems Ventures LLC, which invested $13,000 on the same property. The borrower was Lighthouse Estates LLC. Barker signed the promissory note (attached as Exhibit "F", 210 N. 26th St., Louisville Promissory Note). The personal guarantee (attached as Exhibit "G", 210 N. 26th St., Louisville Personal Guarantee) was executed by all three guarantors on separately notarized signature pages: Barker (Kentucky), Kennedy (Missouri/St. Louis City), and Ariel Mermelshtayn Barker (Indiana/Hamilton County). The ALTA settlement statement confirms the closing. Zero payments have been made. The note is past maturity and in default.

d. 3110 Prairie Avenue, St. Louis, Missouri 63107: $100,000 investment under a joint venture agreement (attached as Exhibit "H", 3110 Prairie Ave. JV Agreement) with a maturity date of November 6, 2025. The borrower was Lighthouse Estates LLC. Kennedy signed the promissory note (attached as Exhibit "I", 3110 Prairie Ave. Promissory Note). The personal guarantee (attached as Exhibit "J", 3110 Prairie Ave. Personal Guarantee) was executed by all three guarantors on separately notarized signature pages: Barker (Kentucky, May 16, 2025), Kennedy (Indiana/Vanderburgh County, May 6, 2025), and Ariel Barker (Indiana/Hamilton County, May 6, 2025). Zero payments have been made. The note is past maturity and in default.

15. In total, Simaya invested $365,000 in capital across four PML transactions. Three of the four investments — totaling $260,000 in principal (the 1156 Van Buren, 210 N. 26th Street,

and 3110 Prairie investments) — remain entirely unpaid and in default. The fourth (1941 W. 10th Place) was "repaid" using Ponzi proceeds recycled from a subsequent investor. Plaintiffs have suffered losses of at least $260,000 in unpaid principal, plus accrued interest and the illusory "return" on the recycled transaction, as a direct result of the conduct described in this Complaint.

## B. Individual Defendants

16. **Van Laurence Barker** ("Barker") is a natural person believed to reside in or around Fort Knox, Kentucky. Barker is a member, the controlling person, and the principal operator of Lighthouse Estates LLC, and the majority owner and co-founder of Starpoint Holdings LLC. Barker's nominal minority membership interest in Lighthouse (10%) substantially understates his control: Barker conceived the enterprise, directed its operations day-to-day, signed the operative PML notes and guarantees personally, controlled the bank accounts and the flow of investor funds, and spoke for Lighthouse in every contemporaneous communication with PMLs and with the institutional lenders. The remaining Lighthouse membership interests are held by Barker family members and a co-founder, as described below, making Lighthouse a Barker-family enterprise in substance regardless of the percentage allocations on the operating agreement. Barker also controlled at least sixteen affiliated entities through which he operated the scheme, including AVS Estates LLC, Redwoods Real Estate LLC, Red Door Legacy LLC, Ceekou LLC, Taihe Estates LLC, Rhino Capital Investments LLC, Contactless Carpet LLC, Cornerstone Property Consulting LLC, Wavewell Foundation Inc., Horizon View Investments LLC, ZiraCo LLC, JAL Solutions LLC, Hummingbird Aero LLC, and Bluestar LLC. On information and belief, since January 2026 Barker has caused new limited liability companies to be formed and has directed the transfer of assets into those entities for the purpose of hindering creditors of the class. Barker conceived, directed, and controlled the scheme alleged in this Complaint, including the solicitation

of PML funds, the recycling of properties through affiliated entities, the personal diversion of investor capital, and the elimination of industry safeguards. Barker personally controlled the movement of millions of dollars in pooled investor funds through Peoples Bank and True Title, positioning himself as the orchestrator of capital flows. Barker also used offshore entities to redirect income streams, including Estella Management (Thailand) and Spain De Los Reyes (Philippines). Barker was arrested by the FBI on December 19, 2025. (Van Barker Angels Meeting Tr. at 14:15–14:30.) Barker was ordered held without bond pending trial on federal criminal charges including attempted online enticement of a minor (18 U.S.C. § 2422(b)) and distribution of child sexual abuse material (18 U.S.C. § 2252A(a)(2)). (attached as Exhibit "K", Order of Detention Pending Trial, at 1–5.)

17. **Joshua James Kennedy** ("Kennedy") is a natural person whose driver’s license lists an address in Evansville, Indiana, but who co-founded and operated the enterprise from Kentucky and maintains substantial business ties in the Commonwealth. Kennedy is a co-founder of the enterprise with Barker, a member of both Lighthouse Estates LLC and Starpoint Holdings LLC, and was involved in operational and rehabilitation oversight for Lighthouse. Kennedy admitted that he "helped van Barker establish this business back in late 2023," that "funds were being rolled over," and that a "Swap System of sorts was developed" using investor capital. Through Starpoint, Kennedy received recurring $5,000 "assistance" fees from many PML transactions. Kennedy signed a letter to investors admitting that "a temporary system evolved where KPL and PML loans were effectively recycled internally" and that "the model became unsustainable." Kennedy retains control of Starpoint and its assets, and no accounting has been provided of the total fees extracted by Starpoint or Kennedy personally over the life of the scheme.

18. **Siyuan Zheng** ("Zheng") is a natural person, spouse of Van Barker, member and registered agent of Lighthouse Estates LLC. Zheng resided at 5720 Brown Ave. #B, Fort Knox, KY, the same address as Lighthouse's principal office. Zheng attended the January 2026 post-arrest Zoom call with investors alongside Kennedy, Curran Barker, and Ariel Barker. As a member of Lighthouse Estates LLC and the spouse of the scheme's principal, Zheng occupied a similar status to and performed similar functions as an officer or director of Lighthouse. Zheng is also the majority member (81%) of CeeKou LLC, a Wyoming limited liability company used as a shell borrower on at least one PML transaction (attached as Exhibit "L", CeeKou LLC Operating Agreement). Plaintiffs are informed and believe, and on that basis allege, that Barker executed a power of attorney in favor of Zheng before his arrest, granting her authority over Lighthouse-related matters during his incarceration. Zheng has also executed joint-venture agreements on Lighthouse transactions. Following Barker's arrest and incarceration, Zheng is the Lighthouse member with the most direct access to the entity's financial records, banking relationships, and remaining assets. (Ex. L.)

**C. Entity Defendants**

19. **Lighthouse Estates LLC** ("Lighthouse") is a Kentucky limited liability company with a principal address at 5720B Brown Ave, Unit B, Fort Knox, KY 40121. The Lighthouse Operating Agreement identifies its members as Ariel Mermelshtayn (also known as Ariel Barker) at 81%, Van Laurence Barker at 10%, and Joshua James Kennedy at 9%. Siyuan Zheng serves as the registered agent and is also identified as a member in filings related to Barker's criminal case. Barker is the controlling person and principal operator of Lighthouse notwithstanding his minority equity position; Ariel Mermelshtayn (Barker's family member) holds the majority interest but did not direct Lighthouse's day-to-day operations during the class period. Lighthouse is the primary

operating entity through which Barker conducted the scheme, including the acquisition and purported rehabilitation of real properties using PML funds. (Lighthouse Operating Agreement at 1.)

20. **Starpoint Holdings LLC** ("Starpoint") is an Indiana limited liability company formed on September 27, 2023, with a principal address in Indianapolis, Indiana (attached as Exhibit "M", Starpoint Holdings LLC Articles of Organization). Its members are Joshua James Kennedy and Van Laurence Barker. Starpoint has been administratively dissolved by the Indiana Secretary of State. Despite its dissolution, Starpoint participated in the operation of the scheme throughout the relevant period, including the origination of the "Takedown Play" email to Aaron Metten and Eric Payne describing the fund-cycling strategy. Starpoint received recurring $5,000 "assistance" fees from PML transactions despite no legitimate services rendered. Starpoint's administrative dissolution does not extinguish its liability for obligations incurred during the period of its active operation.

**D. Non-Party Individuals**

21. The following individuals are not named as Defendants in this action but are described because their roles, admissions, and conduct are integral to understanding the scheme, the control relationships, and the basis for the claims and relief asserted against Defendants.

22. **Marcia Donaldson** ("Donaldson") is a natural person believed to reside in or around Yulee, Florida. Donaldson served as a transaction coordinator and the primary investor-facing intermediary for a cohort of PMLs investing in Lighthouse properties. Donaldson is associated with Hidden Gems TC Services LLC and separately used Hidden Gems Ventures LLC as a personal investment vehicle that participated in the same Lighthouse transactions for which Donaldson acted as transaction coordinator, receiving payments on the closing ledgers separate

and apart from her transaction-coordinator fees. Donaldson actively solicited PML investments, distributed marketing materials touting fixed returns, facilitated the execution of promissory notes, and coordinated with title companies to control the flow of information to investors. Donaldson instructed title companies not to communicate with PMLs regarding disbursements, fabricated closing documents for transactions that never occurred, fabricated insurance documentation, and coordinated the creation of false settlement statements. In initial solicitations, Donaldson assured prospective investors: "I will pay you myself if this goes sideways." Donaldson is identified as a non-party for purposes of establishing the scheme’s investor-facing solicitation and documentation mechanics; Plaintiffs reserve the right to add Donaldson as a Defendant following discovery.

23. **Ronnie J. Harris Jr.** ("Harris") is a natural person believed to reside in Kentucky. Harris is a member of Bear Capital LLC, which received recurring $5,000 "assistance" fees from PML transactions. Settlement statements listed those payments as going to "Starpoint LLC" while escrow ledgers revealed the actual wire recipient was "Bear Capital LLC – Ronnie Harris." Harris is identified as a non-party for purposes of establishing the scheme’s fee-extraction mechanics; Plaintiffs reserve the right to amend.

24. **Aaron Metten** ("Metten") is a natural person believed to reside in Kentucky. Metten participated in investor meetings after the scheme’s collapse and, at the January 2026 meeting, admitted that the Lighthouse portfolio was "underwater," with approximately $60 million in debt outstanding against assets worth "30 to 50 cents on every dollar," and approximately 270 properties on the books. Metten’s admissions are pleaded in Section V.I as evidence of the scheme’s insolvency and of the magnitude of assets for which a receiver is needed. Metten is identified as a non-party for purposes of establishing those admissions; Plaintiffs reserve the right to amend.

25. **Eric Payne** ("Payne") is a natural person believed to reside in Kentucky. Payne was a named recipient of the "Takedown Play" email from Starpoint Holdings describing the fund-cycling strategy. Payne is identified as a non-party for purposes of establishing the scheme's internal communications; Plaintiffs reserve the right to amend.

26. **Maria Bock** ("Bock") is a natural person. Bock operated as a transaction coordinator through Buena Vida Consulting and The Bock Group LLC, managing a separate cohort of PML investors. Bock actively solicited PML investments, facilitated the execution of promissory notes, and served as the primary point of contact for her cohort of investors. Bock is separately identified in internal records as having functioned as a parallel to Donaldson in managing investor relations and processing transactions.

27. **Douglas W. Weede** ("Weede") is a natural person believed to reside in or around Louisville, Kentucky. Weede serves as the Louisville Market President of Peoples Bank Corporation, signing as "LOU. MFCT PRESIDENT" on institutional releases of mortgage. Weede signed, as an authorized officer of Peoples Bank Corporation, at least six Jefferson County releases of mortgage on Lighthouse Estates LLC and AVS Estates LLC properties. Each release discharged a mortgage originally executed by Kentucky Private Lending LLC and subsequently assigned to Peoples Bank Corporation. The releases are dated as follows: three dated April 28, 2025 — Deed Book 13065, Pages 897–898; Pages 913–914; and Pages 918–919 — each discharging a KPL mortgage on a Lighthouse Estates LLC property; and three dated December 26, 2025 — Deed Book 13237, Pages 500–501 (Lighthouse Estates LLC); Pages 654–655 (AVS Estates LLC); and Pages 685–686 (AVS Estates LLC) — each discharging a KPL mortgage assigned to Peoples Bank Corporation. The executed releases are among the institutional instruments through which KPL-originated mortgage positions held by Peoples Bank Corporation as assignee were cleared at

moments when new PML capital was cycled into the collateral, enabling the warehouse-line turnover that made the recycling mechanism operational.

## E. Non-Party Entities

28. The following entities are not named as Defendants in this action but are described because their roles, ownership, and operations are integral to understanding the scheme, the control relationships among the Defendants, and the basis for the relief requested.

29. **Kentucky Private Lending LLC** ("KPL") is a Kentucky limited liability company that operated as the senior hard-money lender on a number of Lighthouse properties. KPL did not originate or service the PML notes at issue in this action; the PML notes were originated by Lighthouse (or by Barker-controlled shell entities such as CeeKou LLC) and marketed to PML investors through transaction coordinators Donaldson and Bock. KPL is identified in this Complaint solely because, on some transactions, the represented exit for PML positions shifted from conventional DSCR refinancing to refinance by KPL, and because certain Lighthouse property positions were later released by the institutional lender (as reflected in Jefferson County releases of mortgage signed by Weede). KPL is not a Defendant. Plaintiffs reserve the right to amend to assert claims against KPL and its principals following discovery.

30. **Bear Capital LLC** is a Harris-controlled limited liability company that received recurring $5,000 "assistance" fees from PML transactions. Bear Capital is identified as a non-party for purposes of establishing the fee-extraction mechanics; Plaintiffs reserve the right to amend.

31. **Peoples Bank Corporation** (collectively, "Peoples Bank") is a Kentucky-chartered banking institution that held institutional lender positions on certain Lighthouse Estates LLC and AVS Estates LLC properties as the assignee of KPL-originated mortgages, as reflected in the Jefferson County releases of mortgage signed by Weede as its authorized officer. Peoples

Bank is identified as a non-party solely to complete the institutional-lender record; Plaintiffs reserve the right to amend.

32. **Barker-controlled affiliated entities.** In addition to Lighthouse and Starpoint, Barker operated through at least seventeen affiliated entities, including AVS Estates LLC, Redwoods Real Estate LLC, Red Door Legacy LLC, Ceekou LLC, Taihe Estates LLC, Rhino Capital Investments LLC, Contactless Carpet LLC, Cornerstone Property Consulting LLC, Wavewell Foundation Inc., Horizon View Investments LLC, ZiraCo LLC, JAL Solutions LLC, Hummingbird Aero LLC, Bluestar LLC, and Brian Barker Aeronautical Company. Properties were bought, sold, swapped, and resold among these entities, generating repetitive fees at each cycle without meaningful rehabilitation.

33. **Offshore and foreign-controlled entities.** Barker used Estella Management & Transactions LLC, a foreign entity run by Rianne Estella from Thailand, to redirect rental income from Lighthouse-owned properties to accounts controlled offshore. Rianne directed tenants to send rent payments to a Bank of America account Estella controlled. Rianne introduced Spain De Los Reyes, a Philippines-based virtual assistant and bookkeeper, into the Lighthouse operation. As of January 2026, Spain De Los Reyes appeared to have more information about Lighthouse's finances than any of Lighthouse's leadership. These offshore entities demonstrate Barker's pattern of moving scheme assets beyond the reach of domestic creditors.

34. **Other affiliated entities.** Additional entities involved in the scheme's solicitation and transaction infrastructure include Hidden Gems TC Services LLC (Donaldson), Buena Vida Consulting (Bock), The Bock Group LLC (Bock), 928 Properties LLC (Harris and Payne), LABB LLC, Clear Path Keys, Black Finn REI, Next Level Investors, and WTO. These entities appeared

repeatedly across transactions, receiving disbursements that differed from what settlement statements represented.

## III. JURISDICTION AND VENUE

35. This Court has subject matter jurisdiction over this class action under 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, and Plaintiffs are citizens of Colorado while Defendants are citizens of Kentucky, Indiana, and Florida. At least 100 class members are citizens of different states from Defendants. Minimal diversity is satisfied.

36. Venue is proper in the United States District Court for the Western District of Kentucky under 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to this action occurred in Kentucky, including the conception and direction of the scheme, the origination and servicing of the PML loans, and the operation of Lighthouse Estates LLC.

### A. Personal Jurisdiction

37. This Court has general personal jurisdiction over Barker, Zheng, and Lighthouse Estates LLC. Barker resides in Fort Knox, Kentucky. Zheng resides at 5720 Brown Ave. #B, Fort Knox, Kentucky. Lighthouse Estates LLC's principal office is located at 5720 Brown Ave. #B, Fort Knox, Kentucky. Kennedy's domicile is uncertain: his driver's license lists an Evansville, Indiana address, but Kennedy co-founded the enterprise in Kentucky, operated out of Kentucky throughout the relevant period, and admitted at the January 2026 meeting that he "helped van Barker establish this business back in late 2023" in Kentucky. Starpoint Holdings LLC is an Indiana limited liability company formed on September 27, 2023, that conducted the entirety of its scheme-related operations from Kentucky. Donaldson is believed to reside in or around Yulee, Florida, based on her LinkedIn profile and email signature listing a 904-area-code telephone

number, while operating Hidden Gems TC Services LLC in connection with Kentucky-based transactions.

38. This Court also has specific personal jurisdiction over all Defendants under Kentucky's long-arm statute, KRS 454.210(2)(a)(1), because each Defendant transacted business within Kentucky that gave rise to this action.

39. Defendants conceived, directed, and operated the Ponzi scheme from Kentucky. Lighthouse Estates LLC and Starpoint Holdings LLC conducted their operations from Kentucky. Barker, Kennedy, Donaldson, and Zheng solicited investments, executed promissory notes, coordinated with Kentucky-based title companies and lenders, and directed the movement of investor funds through Kentucky financial institutions.

40. The PML lending operations were administered from Kentucky through Lighthouse Estates LLC and its affiliated entities, with transaction coordinators operating in coordination with Kentucky Private Lending LLC, a Kentucky entity whose lending operations were structurally intertwined with the PML scheme.

41. All PML transactions flowed through Kentucky-based financial infrastructure, including Peoples Bank and KPL's warehouse-lending operations. The fraudulent scheme was administered from Kentucky and targeted investors nationwide, including Plaintiffs.

42. Exercise of personal jurisdiction over each Defendant comports with federal due process because each Defendant purposefully availed themselves of the privilege of conducting business in Kentucky, Plaintiff's claims arise directly from Defendants' Kentucky-based conduct, and the exercise of jurisdiction is reasonable.

43. For purposes of Local Rule 8.1, Plaintiff Crystal Cervantez-Tkac resides in Denver County, Colorado, and Plaintiff Simaya Innovations LLC — whose sole member and manager

resides in Denver County, Colorado — is a citizen of Colorado. Defendants Van Laurence Barker, Siyuan Zheng, and Lighthouse Estates LLC are residents of Hardin County, Kentucky; Lighthouse Estates LLC maintains its principal place of business in Hardin County. Defendant Joshua James Kennedy's driver's license lists an address in Vanderburgh County, Indiana, but Kennedy co-founded and operated the enterprise from Hardin County, Kentucky throughout the relevant period. Defendant Starpoint Holdings LLC's registered principal office is in Marion County, Indiana, but Starpoint conducted its scheme-related operations from Hardin County, Kentucky. The acts, omissions, and events giving rise to this action occurred in Hardin County, Kentucky, which lies within the Louisville Division of this Court.

## IV. THE PML NOTES ARE SECURITIES UNDER KENTUCKY LAW

44. The PML notes are "securities" within the meaning of the Kentucky Securities Act, KRS 292.310(17), which defines a "security" broadly to include "any note" unless specifically excluded. The PML notes satisfy both the Howey investment contract test and the Reves family resemblance test for notes.

### The PML Notes Are Investment Securities, Not Commercial Loans

45. Defendants will likely argue that the PML notes are ordinary commercial loans exempt from securities regulation. They are not. Under *Reves v. Ernst & Young*, 494 U.S. 56, 66–67 (1990), a note is presumed to be a security. That presumption is rebutted only if the note bears a "strong resemblance" to one of the enumerated categories of non-security notes, evaluated under four factors: (1) the motivations of buyer and seller, (2) the plan of distribution, (3) the reasonable expectations of the investing public, and (4) the existence of an alternative regulatory scheme or other risk-reducing factor.

46. The Sixth Circuit applied this test in *SEC v. Zada*, 787 F.3d 375 (6th Cir. 2015) and held that promissory notes sold to approximately sixty unsophisticated investors in a fraud scheme were securities. "We look to the economic realities, not to monikers or labels that have been used." *Id.* at 380. Each factor confirms that the PML notes are securities.

47. **Factor One: Motivations of buyer and seller.** Under *Reves*, if the seller's purpose is "to raise money for the general use of a business enterprise" and the buyer's purpose is investment, this factor weighs in favor of finding a security. *Zada*, 787 F.3d at 381. Here, Defendants' purpose was to raise capital for Lighthouse's real estate operations — or, more accurately, to fund the Ponzi scheme. PML investors' purpose was investment: they sought fixed returns of 15% to 19% over three to six months on their capital. No PML investor purchased a note for commercial or consumer purposes. This factor weighs heavily in favor of security status.

48. **Factor Two: Plan of distribution.** Under *Reves*, if the notes were offered and sold to a broad segment of the public, this factor favors security status because "common trading for speculation or investment" is present. *Zada*, 787 F.3d at 381. In *Zada*, the Sixth Circuit found this factor satisfied where notes were sold to "approximately 60 unsophisticated people." *Id.* Here, Defendants sold PML notes to at least 125 investors across the United States through a coordinated solicitation campaign involving marketing materials, introductory calls, Investor Passports, and multiple transaction coordinators (Donaldson and Bock). The distribution was nationwide and indiscriminate. This factor weighs heavily in favor of security status.

49. **Factor Three: Reasonable expectations of the investing public.** Under *Reves*, courts ask whether the investing public would reasonably perceive the notes as investments. In *Zada*, the Sixth Circuit held that "the investing public would have had a reasonable expectation that the Zada Notes were investments and thus securities." *Id.* at 382. Here, PML investors

reasonably expected that they were making investments: they advanced capital and expected fixed returns generated by Defendants' real estate operations. The notes were marketed as investment vehicles with fixed returns and property collateral. No investor understood these transactions as commercial loans in which the investor was lending to a known counterparty for a specific commercial purpose. This factor weighs in favor of security status.

50. **Factor Four: Risk-reducing factors.** Under *Reves*, the existence of an alternative regulatory scheme or other risk-reducing factor that makes application of the securities laws unnecessary weighs against security status. In *Zada*, the Sixth Circuit found this factor satisfied because "there were no risk-reducing factors present with the Zada Notes... no alternative regulatory scheme or other factors to reduce the risk." *Id.* at 382. Here, the PML notes were not subject to any alternative regulatory regime. The notes were not FDIC-insured, not regulated by any banking authority, and not subject to any consumer lending protection.

51. The supposed risk-reducing factor — the real estate collateral — was illusory: the properties are worth "30 to 50 cents on every dollar" of the outstanding debt. Peoples Bank's blanket UCC-1 lien further diminished the value of any collateral. Normal industry safeguards (independent appraisals, staged rehabilitation draws, third-party inspections) were eliminated through Harris's dual-control position. This factor weighs heavily in favor of security status.

52. Defendants cannot invoke the *Reves* exemption for "note[s] secured by a mortgage on a home." *Reves*, 494 U.S. at 65. As the court explained in *Mercer v. Jaffe, Snider, Raitt & Heuer, P.C.*, 736 F. Supp. 764 (W.D. Mich. 1990) that exemption is limited to "the traditional face-to-face loan transaction between a borrower and a commercial or consumer lender" and does not encompass notes "offered and sold to a broad segment of the public." *Id.* at 769.

53. The PML notes were not bilateral commercial loans negotiated between a borrower and a single lender. They were investment instruments offered to 125+ investors nationwide through a coordinated solicitation campaign. The mortgage-secured note exemption is inapplicable.

54. Under *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946), an "investment contract" exists where there is (1) an investment of money, (2) in a common enterprise, (3) with an expectation of profits, (4) derived solely from the efforts of others. Each element is met. PMLs invested capital in a common pool of real estate assets managed exclusively by Barker and his associates. PMLs expected fixed returns of 15% to 19% over three to six months. PMLs had no role in managing the properties or conducting the rehabilitations — all operational decisions were made by Barker, Kennedy, Metten, and other Defendants.

55. The fact that the PML notes were nominally secured by real estate does not negate their status as securities. In *SEC v. Lake Havasu Estates*, 340 F. Supp. 1318, 1320–1322 (D. Minn. 1972) the court held that promissory notes secured by mortgages on real property were investment contracts because investors depended on the seller's services in screening borrowers, determining collateral value, and guaranteeing collection. Here, PML investors depended entirely on Defendants' representations regarding property values, rehabilitation plans, and management of the properties—precisely the type of dependence that creates a common enterprise. The properties are worth "30 to 50 cents on every dollar" of the $60 million in outstanding debt, meaning the real estate collateral was grossly insufficient and provided no meaningful risk reduction to investors.

56. The Ponzi scheme context reinforces that the PML notes are securities. In *SEC v. Better Life Club of Am., Inc.*, 995 F. Supp. 167, 176–177 (D.D.C. 1998) the court held that promissory notes issued in a Ponzi scheme were securities under *Howey* because investors

contributed funds to a common enterprise with expectations of profits from the efforts of others. The court rejected the commercial paper exemption, holding it applies only to "true commercial paper sold to sophisticated investors, not to notes offered to the general unsophisticated public." *Id.* at 179. Here, the PML notes were offered to unsophisticated investors nationwide who expected returns generated by Defendants' efforts in acquiring, rehabilitating, and refinancing properties. The notes are securities subject to Kentucky's Blue Sky laws.

57. Kentucky's Blue Sky law is modeled on the Uniform Securities Act and is construed in harmony with federal securities law. *Booth v. Verity, Inc.*, 124 F. Supp. 2d 452, 464 (W.D. Ky. 2000). The federal securities law analysis applies with equal force under Kentucky's statutory framework.

**Defendants Marketed the PML Notes as Passive Investment Products, Not Commercial Credit**

58. Defendants did not hold Lighthouse out as a borrower seeking commercial credit from sophisticated institutional lenders.

59. Defendants held Lighthouse out to PMLs as an investment opportunity. The investor-facing infrastructure Defendants built — a hosted "Investor Passport" (capitalverified.com/investor-passport-van-barker) describing the Starpoint/Lighthouse enterprise and its purported capital structure, standardized property-specific "Info Packets" distributed to prospective PMLs by transaction coordinators, recurring introductory calls conducted by Donaldson and Bock, and a pipeline of prospective-investor referrals funneled through Hidden Gems TC Services LLC, Hidden Gems Ventures, Buena Vida Consulting, and The Bock Group LLC — is the infrastructure of an investment solicitation, not the infrastructure of a commercial-loan negotiation.

60. The Info Packets described prospective transactions as pre-packaged investment offerings, prominently featuring Lighthouse's "typical 15% return," an "ARV" (after-repair value) representation purporting to support a "75% margin of safety," a fixed "DSCR refinancing" exit, and a standardized "LOAN TERMS" block specifying position, funding needed, and closing date — none of which would be present in a bilateral commercial loan negotiated between a borrower and a single sophisticated lender. (E.g., Info Packet, 1156 Van Buren St., Gary, IN at 1–4 ("our typical 15% return," "75% margin of safety," "DSCR refinancing"); Info Packet, 210 N. 26th St., Louisville, KY at 1–3 ("we are comfortable with a moderately-scaled value of $140k," "62% margin of safety on interest payout," "Investor Passport").)

61. The same "Info Packet" form, the same "Investor Passport" URL, and the same economic framing were used across the PML population, confirming that the transactions were offered as a standardized investment product.

62. The ecosystem materials that Defendants and KPL used in parallel to solicit PML capital described the offering in terms that cannot be reconciled with commercial lending. KPL's Q1 2025 marketing deck — used in conjunction with Lighthouse to solicit and retain PML capital — is captioned "Investment Opportunity Overview: A Higher Yield, Lower Risk Investment Alternative," and expressly markets the offering as "an alternative investment vehicle for accredited investors seeking to improve the overall risk-return characteristics of their portfolio," promising "passive income returns," "diversification away from certain macro economic factors," and "stability of principal supported indirectly by underlying real estate assets." (attached as Exhibit "N", KPL Investment Opportunity Overview (Q1 2025 Pitch Deck), at 1–3.) Defendants' own Lighthouse/Starpoint Info Packets and Investor Passports were deployed alongside — and in economic substitution for — that same investor-facing deck. The verbatim language is the

language of a securities offering: "investment opportunity," "investment alternative," "passive income returns," "diversification," and "portfolio." No commercial loan is marketed in those terms to the borrower’s counterparty.

63. The class consists of individual investors, not sophisticated commercial lenders. On information and belief, a substantial portion of the 125-plus PMLs funded their investments from personal savings, retirement accounts, self-directed IRAs, and home-equity withdrawals — not from warehouse lines, institutional capital, or professional lending balance sheets. Plaintiff Tkac herself funded Simaya’s investments with life insurance proceeds received following her husband’s death in 2024.

64. PMLs had no meaningful ability to negotiate the terms of the offering. The notes, joint-venture agreements, personal guarantees, and funding addenda were standardized instruments, prepared by Defendants and presented to PMLs on a take-it-or-leave-it basis. The interest rate (15% to 19%), maturity (three to six months), collateral structure, guarantee form, and closing mechanics were uniform across the PML population and were not the product of arm’s-length negotiation between a borrower and a sophisticated commercial counterparty.

65. The uniformity of the instruments — and the corresponding absence of counterparty-specific risk pricing, covenants, reporting requirements, or control rights — is a structural hallmark of an investment offering. A true commercial loan to a single sophisticated counterparty does not come off a form. The PML notes did.

66. The PML notes accordingly bear every hallmark of the investment instruments held to be securities in *Reves* and *Zada*, and none of the hallmarks of the bilateral, one-on-one commercial loan held non-security in *Bass*. They were investments, offered as investments, to

individual investors who treated them as investments and who had neither the sophistication nor the bargaining power to restructure the terms.

## V. FACTUAL ALLEGATIONS

### A. The Private Money Lending Market and the PML Notes

67. The private money lending (PML) market consists of individual lenders who provide short-term financing for real estate projects, typically with loan terms of three to thirty-six months. PML investors are often sophisticated, high-net-worth individuals seeking fixed returns in a market where traditional bank financing is unavailable.

68. The PML notes offered by Defendants were promissory notes secured by first-position liens on residential properties. Each note promised fixed returns of 15% to 19% over a short maturity: the earlier notes in the scheme typically offered 15% flat to be repaid within six months, and later notes were restructured to offer 19% flat to be repaid within three months.

69. The notes represented that investor funds would be used to purchase properties at a discount, rehabilitate those properties, and generate profit through resale. PML investors relied on the security of the liens and the stability of the real estate market to protect their principal.

### B. Defendants' Scheme — "Deal Recycling" and the "Swap System"

70. Rather than using PML funds for legitimate property acquisition and rehabilitation, Defendants operated a Ponzi scheme through which new PML capital was used to pay returns on prior PML notes. Barker and Kennedy referred to this mechanism as "deal recycling" or the "Swap System."

71. As the scheme’s ability to generate legitimate deal flow deteriorated in 2025 and early 2026, Defendants began acquiring vacant lots and nominal-value parcels — some carrying county-assessed values of approximately $1,000 — and running those parcels repeatedly through

the recycling mechanism solely to generate the appearance of transactional activity and to harvest the associated fees.

72. At the October 2025 Angels Meeting, Barker explained the scheme in his own words: "We basically do refreshes of the loan by swapping out private lenders." He stated: "Deal recycling work is really you're just taking money and funding cash to close. So it's a form of stake lending." Barker admitted that Lighthouse's rehabilitation function was, by his own description, minimal: "We don't do really any refurb."

73. Some properties did receive partial work — rough framing, preliminary plumbing, demolition — but the work was uniformly stalled, incomplete, or abandoned well short of finish, leaving the properties uninhabitable and incapable of generating the rental or refinance value represented to PMLs.

74. The distinction is material: what Defendants represented as a rehabilitation program capable of supporting DSCR refinance and fixed PML returns was in fact, at best, initial demolition and rough-in work on a fraction of the portfolio, inadequate to produce the exit value the PML notes were underwritten against. Barker further stated: "We eliminated ground-level conditions that restricted our ability to serve as exit strategy. There's not an appraisal." On the same recording, Barker acknowledged that the lending arrangement with Peoples Bank operated without the "strict oversight" that would apply in a conventional institutional-lending relationship — a concession that the scheme's institutional-banking backstop was, by design, characterized by reduced scrutiny rather than heightened diligence.

75. Kennedy confirmed the operation of the scheme. At the January 2026 meeting, Kennedy admitted: "I helped van Barker establish this business back in late 2023. It led to a system being created where funds were being rolled over. The rehab fund started being used to keep

paying back notes, and then keep notes going forward. A Swap System of sorts was developed." Kennedy acknowledged that "there was no runway to keep it going much longer."

76. Kennedy also signed a letter to investors in which he admitted that "a temporary system evolved where KPL and PML loans were effectively recycled internally," that "[o]perating costs and debt service were all supported by retained capital being rolled forward into new transactions," and that "[t]hat system only works when inflows remain uninterrupted." Kennedy acknowledged that "the model became unsustainable" and that the goal was to "stop the bleeding."

**C. Property Acquisitions and the Absence of Rehabilitation**

77. Defendants acquired properties ostensibly for rehabilitation, but conducted little or no actual rehabilitation. In many cases, Defendants purchased properties using PML funds from one note, held those properties briefly, and then refinanced them by offering new PML notes for even greater amounts. The properties were recycled multiple times, creating the appearance of deal flow while performing minimal rehabilitation.

78. At the January 2026 meeting, Metten admitted the portfolio was "underwater," with approximately $60 million in debt outstanding against properties Metten himself valued at "30 to 50 cents on every dollar for the loan value." This admission confirms that Defendants had systematically overrepresented property values and underperformed on rehabilitation obligations.

**D. Control Structure and Dual Control Positions**

79. Barker controlled Lighthouse Estates LLC and its affiliated entities. Barker stated: "I control all the factors." Barker directed all aspects of the scheme, including property acquisitions, capital flows, investor solicitation, and the implementation of the "Swap System."

80. The normal industry safeguards — independent appraisals, staged rehabilitation draws, third-party inspections, and arms-length institutional oversight — were absent from the PML origination process.

81. Barker and the transaction coordinators controlled the flow of information to PML investors, the preparation of closing documents, the valuation representations, and the designation of recipients on settlement statements.

82. That absence of independent diligence was not incidental; it was a structural condition without which the "deal recycling" mechanism could not have operated.

**E. Investor Solicitation and Misrepresentations**

83. Donaldson served as the primary investor-facing intermediary who actively solicited PML investments. Donaldson distributed marketing materials highlighting fixed returns, conducted introductory calls with prospective investors, prepared "Investor Passports" containing transaction information, and facilitated the execution of promissory notes.

84. In initial solicitations, Donaldson assured prospective investors: "I will pay you myself if this goes sideways." This representation was false; Donaldson had no such authority or ability. The statement was designed to induce investments by falsely suggesting the existence of a personal guarantee and backstop.

85. Bock performed similar functions for a separate cohort of PML investors. Bock actively solicited investments, facilitated note execution, and served as the primary contact for her investors. Both Donaldson and Bock served as transaction coordinators managing parallel cohorts of PML investors.

86. Donaldson's communications to Plaintiff Tkac during the collapse phase confirm both her agency relationship with Lighthouse and her use of false near-term payment promises to forestall enforcement.

87. On September 5, 2025, Donaldson represented to Tkac by text: "Lighthouse will wire you Monday." No payment was made that Monday. On September 9, 2025, Donaldson represented: "It should go today. Sorry Lighthouse had a lot that went yesterday and yours didn't make it." That message is an admission that Lighthouse was operating a payment queue in which Plaintiff's wire was deprioritized — i.e., that payments were being sequenced based on available cash flow rather than contractual entitlement, the signature feature of a Ponzi scheme in its unwinding phase.

88. Donaldson further acknowledged Lighthouse's role as principal in contradistinction to her own: "While Lighthouse and PMLs can move on a dime, a harder money lender can not it's like turning the titanic.... [I]t wasn't me or Lighthouse."

89. Donaldson admitted that Plaintiff's note had passed maturity and was being serviced only by per-diem charges: "Your money is still making money you are being paid a daily fee for everyday past maturity."

90. Donaldson expanded the investor-facing infrastructure during the class period. In a July 21, 2025 email to PMLs, Donaldson announced that her transaction-coordinator business was "expanding" through a related entity, Hidden Gems Ventures, and introduced Jessica Lauren as a new member of the investor-facing team. Jessica Lauren thereafter functioned as an investor-contact agent for Donaldson, and inquiries directed to Lauren's email were automatically redirected to Donaldson; Donaldson later described Lauren as "still great friends and a PML" who had "gone onto other projects." The coordinated expansion of the transaction-coordinator function

— including Donaldson's use of Hidden Gems Ventures as a personal investment vehicle while simultaneously recruiting additional investor-facing staff under the same operational umbrella — is inconsistent with the arms-length, single-counterparty transaction that would support any effort to recast the PML notes as commercial loans.

**F. Fabrication of Documentation**

91. Defendants systematically fabricated and falsified closing documents, insurance documentation, and settlement statements to conceal the Ponzi scheme from investors.

92. At the 5088 Queens Avenue transaction, Donaldson fabricated a closing document for a transaction that never actually occurred. At 4120 10th Avenue in Birmingham, Donaldson fabricated insurance documentation for a policy that did not exist. Donaldson coordinated with title companies, instructing them not to communicate directly with PML investors regarding disbursements, thereby controlling the information flow to investors.

93. Settlement statements were falsified to conceal the true flow of funds. Documentation listed payments to "Starpoint LLC" for "assistance" fees, but escrow ledgers revealed the actual recipient was "Bear Capital LLC – Ronnie Harris," concealing Harris's direct benefit from the transactions.

**G. Knowledge of Fraud and Continued Solicitation**

94. By August 2025, Legacy Title expressly warned Donaldson: "Van had already taken the funds." Rather than ceasing solicitation, Donaldson "proceeded to generate a second, fabricated document package" and continued to solicit new investments, knowing that investor funds were being misappropriated.

95. This conduct demonstrates that Donaldson, and by extension Defendants as a whole, knowingly and willfully continued the fraud despite explicit notice that funds had been diverted.

**H. The "Takedown Play" Email, the "New Model," and the Fund-Cycling Strategy**

96. Starpoint Holdings LLC originated an internal email referred to as the "Takedown Play," which described the fund-cycling strategy in operational detail. The email confirms that the capital-recycling mechanism was not inadvertent or the result of market conditions but a deliberate strategy conceived and implemented by Kennedy and Barker.

97. In a separate communication, Barker sent a text message to Sislow describing what Barker called the "new model." This was the framework that became the basis for recycling investor capital through repeated property transactions without meaningful rehabilitation.

98. The "new model" was the operational blueprint for the Ponzi: acquire properties in blighted areas at low cost, take out PML notes at inflated values, extract "cash to borrower" payments far in excess of any legitimate rehabilitation expense, and use subsequent PML funds to retire prior notes when they matured — creating the illusion of a performing portfolio while systematically draining investor capital.

**Specific Ponzi Recycling Examples**

99. **2437 Diamond Street, Detroit, Michigan.** This property was cycled through multiple PML transactions. Settlement statements show that Lighthouse used proceeds from a subsequent PML note to retire the prior note on the same property, with substantial "cash to borrower" payments extracted at each cycle. The settlement statements confirm the pattern: new PML capital flowed in, prior PML obligations were retired, and Barker extracted cash at each turn.

100. **1300 Lincoln Avenue / 5088 Queens Avenue.** At 5088 Queens Avenue, Donaldson fabricated a closing document for a transaction that never occurred. No mortgage was recorded and no title policy was issued, despite settlement statement representations to the contrary. The PML investor on this transaction was left with a promissory note purportedly secured by a property interest that did not exist. This was not an isolated error — it was a deliberate fabrication designed to conceal the diversion of investor funds. The 1300 Lincoln Avenue transaction was linked to the same recycling pattern.

101. **4120 10th Avenue, Birmingham, Alabama.** At this property, Donaldson fabricated insurance documentation for a policy that did not exist. The PML investor was told the property was insured; it was not. This fabrication was part of the broader pattern of creating false documentation to maintain the appearance of legitimate transactions while the underlying assets were uninsured, unmanaged, and deteriorating.

102. **5111 Seyburn Avenue.** This property appeared in multiple sequential PML transactions with escalating note values and no corresponding rehabilitation.

103. **1941 W. 10th Place, Gary, Indiana — Plaintiffs' Own Transaction.** Plaintiffs' own experience illustrates the Ponzi mechanics. Simaya invested $105,000 on this property in February 2025. (attached as Exhibit "O", 1941 W. 10th Place Gary JV Agreement.) In October and November 2025, Defendants "repaid" Simaya $126,787.50 on this note (paid in five direct deposits from a Lighthouse-controlled account followed by a final $12,787.50 payment through title). Donaldson herself memorialized the extra-closing nature of the payments in a November 17, 2025 email to Tkac captioned "PML PAYOUT | 1941 W, 10th Place," in which she itemized the payoff as "Principal = $105,000 / Interest = $15,750.00 / Interest payment = -$14,000 (you were paid $14k directly from Lighthouse) / Additional interest = $6,037.50... TOTAL: $112,787.50."

(Donaldson Email, Nov. 17, 2025 at 1.) The parenthetical "directly from Lighthouse" is dispositive: the $14,000 interest payment was made not from legitimate closing proceeds through title, but from Lighthouse's own accounts — i.e., from commingled PML capital — outside the normal refinance ledger — but the repayment was funded not from property sale proceeds or legitimate business income, but from new PML capital invested by Neelema Sinha. The drive-download documents confirm that Sinha's funds were recycled to pay off Simaya's prior note on this property. The subfolder "Now Neelema's Property — recycled funds to pay me" in Tkac's own records describes the transaction in those terms. This is the defining feature of a Ponzi scheme: using new investor money to create the appearance that prior investments are performing.

**I. Financial Insolvency and Asset Dissipation**

104. As of January 2026, the Lighthouse portfolio was insolvent. At the January 2026 meeting, Metten stated that the enterprise carried "approximately $60 million in debt outstanding against properties worth 30 to 50 cents on every dollar," estimated "a 60% loss if we sold everything as is," and confirmed approximately 270 properties on the books, all unmanaged and deteriorating.

105. Subsequent class-member communications and Defendants' own contemporaneous statements place the debt figure at "about 50 million," reflecting the enterprise's post-collapse inability to service approximately that magnitude of lender obligations.

106. Plaintiffs allege, in the alternative, that the scheme's outstanding debt is between approximately $50 million and $60 million; in either case, the portfolio's collateral value is a small fraction of the outstanding debt. Metten's "30 to 50 cents" estimate now appears to have been charitable: independent investigation by class members has revealed that, for a substantial portion of the portfolio, the current realizable value is closer to 1% to 20% of the outstanding loan balance

once accrued code violations, unpaid property taxes, and municipal fines are netted against the distressed sale value. In Kentucky in particular, several Lighthouse-owned structures have already been condemned or demolished by local authorities.

107. Defendants have a documented pattern of transferring assets between affiliated entities to conceal the true ownership and control structure. Defendants used offshore entities, including Estella Management in Thailand and Spain De Los Reyes in the Philippines, to redirect rental income and manage finances outside the scrutiny of domestic authorities.

**J. Barker Family Control, Personal Asset Diversion, and Affiliated Entity Web**

108. Barker operated the scheme through a web of at least sixteen affiliated entities, many controlled by Barker family members. These entities include: Lighthouse Estates LLC, Starpoint Holdings LLC, AVS Estates LLC, Redwoods Real Estate LLC, Red Door Legacy LLC, Ceekou LLC, Taihe Estates LLC, Rhino Capital Investments LLC, Contactless Carpet LLC, Cornerstone Property Consulting LLC, Wavewell Foundation Inc., Horizon View Investments LLC, ZiraCo LLC, JAL Solutions LLC, Hummingbird Aero LLC, and Bluestar LLC.

109. On information and belief, since January 2026 Barker has caused new limited liability companies to be formed and substituted into the web of affiliated entities in an ongoing effort to obscure the control structure. Properties were repeatedly bought, sold, swapped, and resold among these affiliated entities, generating repetitive fees at each cycle without meaningful rehabilitation.

110. The operating agreements of the core affiliated entities, produced in the corporate file extracted from Defendants' own records, confirm the concentration of control in Barker and Barker-family members: Starpoint Holdings LLC is owned 81% by Van Laurence Barker and 19% by Joshua James Kennedy (Starpoint Operating Agreement at 1); Lighthouse Estates LLC is

owned 81% by Ariel Mermelshtayn (Ariel Barker), 10% by Van Laurence Barker, and 9% by Joshua James Kennedy (Lighthouse Operating Agreement at 1); AVS Estates LLC is owned 34% by Van Laurence Barker, 33% by Ariel Barker, and 33% by Siyuan Zheng (attached as Exhibit "P", AVS Estates LLC Operating Agreement, at 1).

111. Across the three core entities Barker-family members hold substantially complete ownership, confirming that the "sixteen affiliated entities" are not independent operators but the Barker family's own multi-pocket corporate structure. The corporate records also include a folder expressly labeled "Red Door Legacy (Clone of Lighthouse Estates for Refi Batching)" — a contemporaneous internal description, in Defendants' own words, of an entity created for the specific purpose of batching refinance transactions through an additional affiliated shell.

112. Barker personally directed the movement of pooled investor funds. At the October 2025 Angels Meeting, Barker described moving "about $5 million in stable deposits vis-a-vis our title company," including True Title's "$3 million move" and "about $2 million" from Barker and his partners. Barker explained that each "$3 million" stacked with the bank enabled "another $10 million of capital" through a commitment from affiliated local banks, "for what really becomes a copy of Kentucky Private Lending for a different state."

113. These statements demonstrate that Barker personally orchestrated the movement of millions of dollars in pooled investor funds and leveraged those deposits to unlock additional institutional capital.

114. Each debt recycling cycle generated repetitive fees extracted by Barker and his associates, including: transaction coordination fees, property management fees on vacant or uninhabitable properties, inflated rehabilitation budgets for work that was never performed, and "assistance" fees paid to affiliated entities. Settlement statements consistently showed substantial

"cash to borrower" payments "far in excess of what would be expected in a legitimate fix-and-flip transaction," confirming that Lighthouse "intentionally sought properties in blighted areas to take out the liquidity in the form of cash for the purposes of sustaining their new business model."

115. Barker used offshore entities to redirect income streams beyond the reach of domestic creditors. Rent payments from Lighthouse-owned properties were sent to Estella Management — a company that, despite appearing as a local property management firm, was actually run by Rianne Estella from Thailand.

116. Estella Management directed tenants to send rent payments to a Bank of America account it controlled. Rianne was subsequently terminated by Barker for "stealing money and fraud," but Rianne had introduced Spain De Los Reyes, a Philippines-based virtual assistant, into the Lighthouse operation.

117. As of the January 2026 meeting, questions about Lighthouse's financial conditions were directed not to Lighthouse leadership but to Spain De Los Reyes, and the "virtual assistant appeared to have more information about Lighthouse's finances than any of the Lighthouse leadership."

118. Zheng, as Barker's spouse and a member of Lighthouse Estates LLC, resided at the same address as Lighthouse's principal office and had direct access to its accounts and records. Zheng attended the January 2026 post-arrest Zoom call with investors alongside Kennedy, Curran Barker, and Ariel Barker (who attended only the last 20 minutes).

119. Following Barker's incarceration, Zheng is the Lighthouse member with the most direct access to the entity's financial records, banking relationships, and any remaining assets.

120. The Barker family members present at the January 2026 call — including Curran Barker, who communicated through investigator Chris Adanane that investors were "looking at

the wrong side of the equation" and that there were "deeper pockets elsewhere" — demonstrated a coordinated effort to deflect responsibility while retaining access to scheme assets.

121. Kennedy co-founded the enterprise with Barker, admitted to "establishing this business back in late 2023," and developed the "Swap System" that was the core mechanism of the Ponzi scheme. Kennedy is a member of Starpoint Holdings LLC, which received recurring $5,000 "assistance" fees from many PML transactions — payments that flowed directly to Kennedy through Starpoint. Kennedy signed a letter to investors admitting that "a temporary system evolved where KPL and PML loans were effectively recycled internally," that the system "only works when inflows remain uninterrupted," and that "the model became unsustainable." Despite these admissions, Kennedy retains control of Starpoint and its assets, and no accounting has been provided of the total fees extracted by Starpoint or Kennedy personally over the life of the scheme.

**K. The Class of Investors**

122. At least 125 PML investors across the United States have invested in the PML notes. These investors come from diverse geographic locations and include high-net-worth individuals, retirement account holders, and family offices. The investors are identifiable through the PML investor database maintained by KPL. All class members have been injured by Defendants’ misconduct through loss of principal and the elimination of promised returns.

123. Class numerosity and cohesion have been further confirmed by the class’s own self-organization following the scheme’s collapse.

124. On January 2, 2026, a PML investor posted in a scam-investigation Facebook group identifying the Lighthouse enterprise. Within days, more than twenty additional PML investors

independently made contact in response to that post, forming a common communications channel through which class members have since coordinated.

125. On January 3, 2026 — the day after that post — Defendant-adjacent transaction coordinator Maria Bock deactivated her Facebook account.

126. The scheme's collapse was further signaled by institutional failures: Lighthouse's property insurance was canceled for non-payment by notice dated October 24, 2025 — meaning that the real-property collateral securing the PML notes was, from that date forward, uninsured against loss, a fact never disclosed to PMLs contemporaneously.

**L. Regulatory and Industry Safeguards Eliminated**

127. Normal safeguards in the private-lending market — independent appraisals, staged rehabilitation draws tied to verified work completion, third-party property inspections, and arms-length institutional oversight — were absent from the PML transactions Defendants solicited.

128. Defendants controlled the valuation representations, the preparation and content of closing documents, the information relayed to PML investors through the transaction coordinators, and the designation of recipients on settlement statements.

129. PML investors had no practical ability to verify the underlying facts independently, and the absence of institutional diligence was a precondition to the scheme's operation.

**M. Admissions of Ponzi Scheme Mechanics**

130. In a January 2026 Zoom call, Lighthouse representatives acknowledged that they did not have funds to repay investors and admitted that the business model—involving cycling private money lenders in and out—had "fallen apart due to not enough cash or liquidity." They stated there was "no remaining financial runway to sustain operations, as liquidity had been exhausted once new investor funds stopped coming in."

131. These admissions constitute clear acknowledgment by Defendants that the scheme depended on a continuous flow of new investor capital, which is the defining characteristic of a Ponzi scheme. Once that flow stopped, the scheme collapsed.

132. Barker's contemporaneous text messages to Plaintiff Tkac made the Ponzi mechanics even more explicit.

133. In a November 2025 text exchange, Barker described the operation in his own words: "Basically what we are doing now is recycle over our portfolio into the HML in iterations, while buying finished product off of their books."

134. In the same exchange, Barker acknowledged the failure rate baked into his own model: "The failure rate out there is about 50-50, and I am usually personally involved in the deal rescues we do."

135. Barker described the operational mechanics of extracting cash from unfinished projects: "It's a really cool model that basically allows us to juice the equity of unfinished houses anywhere straight into cash... divorcing returns from the day-to-day outcome of the house."

136. Barker confirmed that the structure of payouts was untethered from any property's legitimate performance and instead calibrated to available cash flow: "[W]e try to start paying down the balance off-books ahead of closing in increments of $10–$20k, based on cashflow."

137. In the same thread, Barker simultaneously represented that the enterprise had "a 100% project payout record" while acknowledging that Plaintiff's own position was past due and that he had earlier believed it had been "rolled over." These are not inferred Ponzi mechanics; they are Barker's admissions of the Ponzi mechanics in his own words to the lead Plaintiff.

138. Barker's contemporaneous endorsement of Donaldson confirms the agency relationship between Lighthouse's principal and the transaction coordinator through whom

Lighthouse solicited and collected PML capital. In the same text thread, Barker assured Tkac: "My confidence in Marcia is 100%, if there was confusion I apologize and will mention it to her."

139. That statement, delivered by Lighthouse’s principal to a Lighthouse PML investor, both confirms Donaldson’s role as Lighthouse’s operational agent and forecloses any defense by Lighthouse that Donaldson was acting outside the scope of her authority.

**N. Van Barker’s Criminal Charges and Pattern of Deception**

140. On December 16, 2025, the FBI executed a search warrant at Barker’s residence, and on December 19, 2025, Barker was arrested and ordered detained pending trial.

141. Barker faces two federal criminal charges: attempted online enticement of a minor in violation of 18 U.S.C. § 2422(b), and distribution of child sexual abuse material in violation of 18 U.S.C. § 2252A(a)(2). (attached as Exhibit "Q", Criminal Affidavit; Ex. K.)

142. The pretrial detention order notes that Barker has "significant family or other ties outside the United States" — consistent with his use of offshore entities in Thailand and the Philippines to redirect scheme assets. Barker used sophisticated methods to conceal his criminal conduct, including virtual private networks (VPNs) and multiple accounts to hide his identity and location. This pattern of concealment parallels Barker’s operation of the Ponzi scheme through layered entities, falsified documentation, and fabricated accounts. (Crim. Aff.)

143. The criminal charges establish a broader pattern of dishonesty and deception. Barker’s willingness to engage in serious federal crimes demonstrates his character and capacity for deception, and supports the inference that Barker designed and directed the Ponzi scheme with full knowledge of its fraudulent nature.

**O. Causation, Damages, and Property-Level Insolvency**

144. The causal chain between Defendants' scheme and Plaintiffs' loss is direct. Had Defendants disclosed that (a) PML capital was being used to retire pre-existing KPL warehouse positions rather than to acquire and rehabilitate the stated collateral, (b) no meaningful rehabilitation was being performed on the properties serving as collateral, (c) the purported "repayments" on earlier PML notes were being funded by successor PML capital, and (d) the enterprise's consolidated debt materially exceeded the fair market value of the aggregate collateral, no reasonable PML investor — including Plaintiffs — would have advanced capital. Every element of Simaya's $365,000 in invested principal was advanced in reliance on representations that, by Defendants' own later admissions, were knowingly false at the time they were made.

145. **Plaintiff Simaya's damages by transaction.** (a) 1941 W. 10th Place, Gary, Indiana: $105,000 principal advanced February 25, 2025. Nominal "repayment" of $112,787.50 in October–November 2025 was funded by Ponzi proceeds recycled from successor PML Neelema Sinha; the "return" is subject to disgorgement, and the transaction gave rise to no legitimate profit on underlying property performance. (b) 1156 Van Buren Street, Gary, Indiana: $95,000 principal advanced August 2025; zero payments received; note in default. $113,209.67 of the closing was paid to KPL rather than applied to acquisition or rehabilitation, confirming zero deployment of Plaintiff's capital to the stated purpose. (c) 210 N. 26th Street, Louisville, Kentucky: $65,000 principal advanced; zero payments received; matured September 11, 2025; note in default. (d) 3110 Prairie Avenue, St. Louis, Missouri: $100,000 principal advanced; zero payments received; matured November 6, 2025; note in default. Total unpaid principal: $260,000. Total contract damages including promised fixed returns calculated at the rates specified in the notes: not less than $300,000, subject to full quantification at proof. Plaintiff further seeks prejudgment interest under KRS 360.010, rescissionary damages under KRS 292.480(1), restitution under Kentucky

common law, and — on the 1941 W. 10th Place transaction — disgorgement of the Ponzi-funded repayment.

146. **Property-value analysis at origination versus present.** The PML notes were originated at note balances that represented properties as acquired at meaningful discount to as-rehabilitated value and as supporting fixed returns on short-horizon turnover.

147. The Metten admissions at the January 2026 KPL meeting establish that, across the Lighthouse portfolio, present value is at most "30 to 50 cents on every dollar" of outstanding loan balance, and Metten himself estimated a "60% loss if we sold everything as is." (KPL Meeting Tr. at 26–28.)

148. Independent investigation by class members confirms, and Plaintiffs on that basis allege, that for a substantial portion of the portfolio the realizable value is closer to 1% to 20% of outstanding balance once code violations, unpaid property taxes, municipal fines, and condemnation status are netted against distressed-sale proceeds.

149. Several Kentucky Lighthouse properties have been condemned or demolished by local authorities; on information and belief, additional properties are abandoned and uninsured; further properties have been foreclosed by senior lienholders including Peoples Bank Corporation.

150. **Portfolio-level insolvency.** Approximately 270 properties are on Lighthouse’s books against approximately $50 million to $60 million in outstanding debt.

151. Even taking Metten’s charitable 30-to-50-cents-on-the-dollar estimate at face value, the portfolio is insolvent on a current-value basis by between $25 million and $42 million. Applying the 1%-to-20% realizable-value figures supported by class-member investigation of condemned and distressed parcels, the shortfall is substantially larger.

152. The class-wide loss exceeds $24 million; Plaintiffs reserve the right to amend the aggregate damages figure as discovery confirms the current disposition of each parcel (sold, foreclosed, abandoned, condemned, demolished, or held).

**P. Scienter: Defendants' Contemporaneous Knowledge of Falsity**

153. Defendants' contemporaneous admissions — in transcripts, letters, and text messages — establish knowledge of the scheme's fraudulent character at the time each PML note was sold. Kennedy admitted he "helped van Barker establish this business back in late 2023" and that, from inception, "a system [was] created where funds were being rolled over."

154. Kennedy's investor letter concedes that "a temporary system evolved where KPL and PML loans were effectively recycled internally," that "operating costs and debt service were all supported by retained capital being rolled forward into new transactions," and that "that system only works when inflows remain uninterrupted." (attached as Exhibit "R", Kennedy Investor Letter, at 1–2.)

155. Barker's October 2025 Angels Meeting statements — "we basically do refreshes of the loan by swapping out private lenders"; "we don't do really any refurb"; "there's not an appraisal"— are admissions that the representations being made to PMLs at the same moment (fixed returns on rehabilitated properties backed by appraised collateral) were false.

156. Barker's November 2025 text to Tkac — that the enterprise was "recycling over our portfolio into the HML in iterations, while buying finished product off of their books"— was made while Tkac's Simaya notes were outstanding and unpaid. Defendants knew. They said so.

157. The timeline of collapse indicators likewise establishes scienter. By at least May 2025 — four months before the October 2025 Angels Meeting and nine months before the

scheme's public collapse — PML capital on new transactions was being used to retire KPL warehouse positions rather than to acquire and rehabilitate the stated properties.

158. On the 1156 Van Buren transaction, Simaya's $95,000 was deposited and $113,209.67 was immediately paid out to KPL as a loan payoff, meaning Simaya's funds were used to retire a pre-existing KPL obligation rather than to fund acquisition or rehabilitation — the precise mechanic Kennedy later admitted as the "Swap System." By August 2025, Legacy Title had warned Donaldson directly that "Van had already taken the funds," and Donaldson responded by fabricating a second document package rather than halting solicitation. By September 2025, Donaldson was texting Plaintiff Tkac a cascade of promised-but-unpaid wires ("Lighthouse will wire you Monday"; "It should go today") while simultaneously acknowledging that payments were being queued based on available cash flow rather than contractual entitlement. That sequence — known fund diversion (May), express third-party warning (August), payment-queue acknowledgment (September) — establishes contemporaneous scienter well before the scheme's January 2026 public collapse.

159. Defendants' financial sophistication reinforces the inference that their representations were knowingly false. Barker conceived and directed the enterprise, signed the operative PML notes and personal guarantees, controlled the movement of millions of dollars through Peoples Bank and True Title, and — by his own description — was "personally involved in the deal rescues we do," with a purported "100% project payout record."

160. Kennedy was a co-founder with a self-described role in "establish[ing] this business" and designing the "Swap System." These are not unsophisticated actors who unwittingly drifted into a Ponzi mechanic; they are operators with a granular understanding of private-money lending, DSCR refinance, warehouse-line turnover, and real-estate rehab economics, who

represented to PMLs that the enterprise was doing one thing (acquire, rehabilitate, refinance, repay) while knowing it was doing another (swap PML capital in to retire KPL capital, while performing little or no rehabilitation).

## VI. CLASS ACTION ALLEGATIONS

161. Plaintiffs bring this action as a class action under Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all others similarly situated.

162. **Class Definition.** The proposed class (the "Class") is defined objectively as: All natural persons and entities who, between January 1, 2023 and the date of class certification, purchased one or more promissory notes, joint-venture interests, or funding agreements originated by Lighthouse Estates LLC, Starpoint Holdings LLC, or any Barker-controlled affiliated entity, in connection with the financing of real property acquisitions, and who have not been repaid the full principal plus contractually promised return on each such instrument. Excluded from the Class are: Defendants; Defendants' officers, directors, members, managers, agents, and employees; Defendants' immediate family members; any entity in which any Defendant holds a controlling interest; and the legal representatives, heirs, successors, and assigns of any excluded person. This definition is objective; turns on facts capable of documentary proof (existence of an instrument, identity of the issuer, and payment status); does not require a finding of liability on any claim; and avoids the "fail-safe" problem by not defining class membership by reference to the merits.

163. **Ascertainability.** Class members are ascertainable from objective records in Defendants' possession or the possession of identifiable third parties. Lighthouse, Starpoint, and the affiliated entities maintained PML closing ledgers, promissory note registers, personal-guarantee files, and investor-communication records. Kentucky Private Lending LLC and Peoples Bank Corporation maintained parallel records of the institutional positions that the PML capital

was used to retire. True Title, Legacy Title, and the other closing agents who handled the PML transactions maintained settlement statements and wire records identifying the PMLs by name, address, and funding amount on each closing. The transaction coordinators — Donaldson (through Hidden Gems TC Services LLC) and Bock (through Buena Vida Consulting and The Bock Group LLC) — maintained investor-contact rosters and correspondence. Membership in the Class can be determined from these records by mechanical application of the objective class definition, without any merits inquiry.

164. **Numerosity.** The Class consists of at least 125 PML investors. The class is sufficiently numerous that joinder of all members is impracticable.

165. Numerosity is satisfied. In securities fraud cases involving nationally distributed investment instruments, courts routinely find numerosity met with far fewer investors than are present here. Here, the class consists of at least 125 PML investors dispersed across the United States, making joinder impracticable.

166. **Commonality.** Common questions of law and fact predominate, including: whether the PML notes are securities under Kentucky law; whether Defendants offered and sold the PML notes by means of untrue statements of material fact or omissions; whether the PML notes were registered under the Kentucky Securities Act; whether Defendants are liable as control persons, partners, officers, directors, or persons occupying similar status under KRS 292.480(4); whether each Defendant can carry the burden of proving the statutory defense under KRS 292.480; and the appropriate measure of damages.

167. Commonality is satisfied. Courts require only "one common question" that will "advance the litigation" to satisfy Rule 23(a)(2). Common questions here include whether the PML notes are securities, whether Defendants made material misrepresentations and omissions, whether

the notes were registered, whether Defendants acted with scienter, and whether Defendants are liable as control persons.

168. **Typicality.** Plaintiffs' claims are typical of the claims of the Class. Plaintiff Simaya's four separate PML investments — executed between February and August 2025, deployed across three states (Indiana, Kentucky, and Missouri), routed through three separate closing agents, and supported by the form-instrument architecture (promissory note, joint-venture or funding agreement, personal guarantee) used across the PML population — exemplify the full temporal and geographic sweep of the scheme. All four Simaya transactions involved the same types of misrepresentations (fixed short-term returns on rehabilitated real-property collateral), the same scheme mechanics (PML capital used to retire pre-existing KPL or PML positions rather than to acquire and rehabilitate the stated collateral), and the same type of injury (loss of principal and contractually promised return). One Simaya transaction (1941 W. 10th Place) was "repaid" from successor PML capital, exposing the Ponzi mechanic; three remain in default. Plaintiffs' mixed exposure — including both a Ponzi-funded nominal "repayment" and three outright defaults — makes Plaintiffs typical of class members across every sub-segment of the scheme, and positions Plaintiffs to prosecute the full range of remedies (rescission, restitution, and disgorgement) on behalf of the Class.

169. Typicality is satisfied. Rule 23(a)(3) requires only that "claims of class representatives and class members arise from same course of conduct" and "rely on same legal theory"—it does not require identical claims or identical defenses. Simaya's four investments across three states over a nine-month period are typical of the class: all PML investors received the same types of promissory notes, the same types of misrepresentations regarding property

values and use of funds, and suffered the same type of injury (loss of principal and promised returns).

170. Adequacy. Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs have no interests antagonistic to or in conflict with the class. Plaintiffs have retained experienced class action counsel, Loftus & Eisenberg, Ltd., which has the resources and experience to prosecute this litigation effectively.

171. Adequacy is satisfied. Rule 23(a)(4) applies a two-prong test: (1) representatives must have common interests with the class, and (2) representatives must vigorously prosecute through qualified counsel. Plaintiffs have the same interest as all class members—recovery of losses from the Ponzi scheme. Plaintiffs have retained experienced class action counsel with the resources and expertise to prosecute complex securities fraud litigation. Plaintiff satisfies both prongs of the adequacy requirement.

172. **Uniformity of scheme mechanics and supporting proof.** The scheme operated uniformly across all PML investors. All class members were solicited through the same two-channel transaction-coordinator apparatus (Donaldson/Hidden Gems and Bock/Buena Vida/Bock Group) operating under Lighthouse's direction. All class members received substantially identical marketing materials and "Investor Passport" representations. All class members purchased promissory notes executed on materially identical form instruments, offering materially identical economic terms (15% to 19% fixed returns, three-to-six-month maturities, personal guarantees from Barker and Kennedy, and first-position lien representations). All class members were subject to the same recycling mechanism: PML capital on each new transaction was deployed in material part to retire pre-existing KPL warehouse positions or prior PML positions, not to acquire and rehabilitate the stated collateral. And all class members' loss flows from the same common proof:

Barker's recorded Angels Meeting admissions, Kennedy's investor letter and KPL Meeting admissions, the fabricated closing and insurance documents, the Peoples Bank releases of mortgage, and the contemporaneous text exchanges between Lighthouse's principals and the PMLs. The same evidence that would establish liability in an individual PML's case will establish liability class-wide.

173. **Predominance.** Common questions of law and fact predominate over any individual questions. The core issues — whether the PML notes are securities under Kentucky law; whether Defendants offered and sold the PML notes by means of untrue statements of material fact or omissions; whether the PML notes were registered; whether the scheme operated as a Ponzi; whether Defendants are liable as control persons, partners, officers, directors, or persons occupying similar status under KRS 292.480(4); whether Defendants acted with scienter; and the appropriate measure of rescissionary, restitutionary, and disgorgement damages — are common to all class members and will be resolved by common proof.

174. Individual questions regarding each class member's investment amounts, transaction dates, and specific property exposures are not questions of liability; they are damages calculations that can be resolved on a per-investor basis through mechanical application of each class member's ledger to the common liability findings. Courts routinely certify Ponzi-scheme class actions on this exact showing; the common operation of the scheme is the answer to any predominance objection.

175. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The class members are geographically dispersed across the United States. Individual PML investments range from tens of thousands to hundreds of

thousands of dollars, making individual prosecution impracticable for many class members. A single adjudication of the common issues will promote judicial efficiency and consistent results.

## VII. STATUTE OF LIMITATIONS AND FRAUDULENT CONCEALMENT

176. The class period for this action runs from January 1, 2023 through the present. The scheme began in late 2023 when Barker and Kennedy established the enterprise, and continued through at least February 2026, when Defendants' own representatives admitted the scheme had collapsed.

177. KRS 292.480(3) provides a three-year limitations period for claims under the Kentucky Securities Act, running from "the date of the contract of sale." Simaya's earliest investment (February 25, 2025) falls well within the limitations period as of the filing date. For class members whose investments predate April 2023, fraudulent concealment tolling extends the limitations period.

178. Under Sixth Circuit law, the statute of limitations is tolled where a defendant fraudulently conceals facts giving rise to the cause of action. *Hoover v. Langston Equipment Associates, Inc.*, 958 F.2d 742, 744 (6th Cir. 1992). Fraudulent concealment tolling requires three elements: "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Id.* at 744.

179. **Wrongful concealment.** Defendants engaged in systematic, affirmative concealment of the Ponzi scheme throughout its operation. Defendants fabricated settlement statements to conceal the true flow of funds. Donaldson fabricated closing documents for transactions that never occurred (5088 Queens Avenue) and fabricated insurance documentation for policies that did not exist (4120 10th Avenue, Birmingham). Donaldson instructed title

companies not to communicate directly with PML investors regarding disbursements, controlling the flow of information to prevent investors from discovering the recycling of funds. Barker used offshore entities — Estella Management in Thailand and Spain De Los Reyes in the Philippines — to redirect rental income and scheme proceeds beyond the reach of domestic detection. Properties were recycled through at least sixteen affiliated entities to create the appearance of legitimate deal flow while concealing that new investor capital was being used to pay prior obligations. Settlement statements listed payments to "Starpoint LLC" but escrow ledgers revealed the actual recipient was "Bear Capital LLC – Ronnie Harris," concealing the true beneficiaries. These acts constitute affirmative, deliberate concealment — not mere silence or omission.

180. **Failure to discover within the limitations period.** PML investors did not and could not discover the Ponzi scheme within the limitations period because Defendants' concealment was designed to prevent detection.

181. The fabricated documents, gag orders on title companies, offshore entity structures, and recycling of properties through multiple entities all operated to create an impenetrable barrier between investors and the truth. PML investors relied on the transaction documents, settlement statements, and representations provided by Defendants and had no independent means of verifying the true use of their funds.

182. The scheme was not publicly known until January 2026, when Lighthouse representatives acknowledged in a Zoom call that their business model involved cycling private money lenders in and out and that the model had "fallen apart due to not enough cash or liquidity."

183. **Due diligence.** Plaintiffs and the class exercised due diligence in monitoring their investments. PML investors reviewed the transaction documents, settlement statements, and communications provided by Defendants. However, no amount of due diligence could have

uncovered the scheme: the documents themselves were fabricated, the settlement statements were falsified, and the title companies had been instructed not to communicate with investors. The Ponzi scheme was designed to be undetectable from the investor's vantage point — and it succeeded until Defendants' own representatives admitted its existence in January and February 2026. The class exercised reasonable diligence, and the limitations period was tolled until the date of discovery.

## VIII. CLAIMS FOR RELIEF

### COUNT I: VIOLATION OF KRS 292.480(1) — SALE OF SECURITIES BY MEANS OF UNTRUE STATEMENTS OF MATERIAL FACT OR OMISSIONS

*(Against Barker, Kennedy, Zheng, Lighthouse Estates LLC, and Starpoint Holdings LLC)*

184. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated.

185. KRS 292.480(1) provides that any person who offers or sells a security by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made not misleading, is liable to the person purchasing the security. Under KRS 292.480(1), the seller bears the burden of proving that he did not know and in the exercise of reasonable care could not have known of the untruth or omission.

186. Fraud is not an element of a claim under KRS 292.480.

187. Civil liability for violations of KRS 292.320 and KRS 292.340 is predicated on a violation of KRS 292.480.

188. Defendants offered and sold securities—the PML notes—by means of untrue statements of material fact and omissions of material facts necessary to make the statements made not misleading. The liability of individual Defendants differs as follows:

a. **Van Laurence Barker and Lighthouse Estates LLC.** Barker conceived and directed the scheme. He admitted to "deal recycling," performing "no refurb," and controlling "all the factors." Barker’s admissions at the October 2025 Angels Meeting establish that he knew the representations made to PMLs regarding property rehabilitation, property value, and use of funds were false. Lighthouse Estates LLC was the primary entity through which the securities were offered and sold.

b. **Joshua James Kennedy and Starpoint Holdings LLC.** Kennedy admitted he "helped van Barker establish this business back in late 2023," that "funds were being rolled over," and that "a Swap System of sorts was developed." Kennedy signed a letter admitting that "a temporary system evolved where KPL and PML loans were effectively recycled internally" and that "the model became unsustainable." Starpoint originated the "Takedown Play" email describing the fund-cycling strategy.

c. **Marcia Donaldson.** Donaldson was the primary investor-facing intermediary who solicited PML investments. She distributed marketing materials, conducted introductory calls, provided "Investor Passports," and facilitated note execution. Donaldson fabricated closing documents for the Queens Avenue transaction, fabricated insurance documentation for the Birmingham property, instructed title companies not to communicate with PMLs, and continued soliciting investments after she knew funds were being misappropriated. By August 2025, Legacy Title expressly warned Donaldson that "Van had already taken the funds." Donaldson nonetheless "proceeded to generate a second, fabricated document package."

d. **Siyuan Zheng.** Zheng is a member and registered agent of Lighthouse Estates LLC and the spouse of Barker. Zheng resided at the same address as Lighthouse's principal office and attended the January 2026 post-arrest investor meeting, demonstrating involvement in and knowledge of the scheme. As a member and spouse of the principal operator, Zheng occupied a status similar to an officer or director and participated in the solicitation and ongoing management of PML funds.

189. The scheme could not have operated without the participation of non-party individuals whose conduct is detailed in the Parties section of this Complaint: Ronnie J. Harris Jr. occupied a dual-control position through King Harris Bancorp and Bear Capital that enabled the

bypass of normal industry safeguards and received recurring $5,000 fees on many PML transactions; Aaron Metten, as President of KPL, directed KPL's origination and servicing of senior hard-money loans structurally linked to the PML capital cycle; Eric Payne, as Managing Partner of KPL, co-directed those operations and was a named recipient of the "Takedown Play" email; and Maria Bock solicited a separate cohort of PML investors through Buena Vida Consulting and The Bock Group LLC, recruiting approximately half of the PML investors in the class and functioning as an operational parallel to Donaldson in the transaction-coordinator layer of the scheme. Plaintiffs reserve the right to assert claims against these individuals at a later stage of this litigation.

190. Every Defendant who materially aided in the sale is jointly and severally liable under KRS 292.480(4), which provides that "every... agent who materially aids in the sale or purchase is also liable jointly and severally with and to the same extent as the seller or purchaser."

191. Plaintiffs and the class are entitled to recover the consideration paid for the PML notes, with interest at six percent per year from the date of payment, less any income received on the securities, as provided by KRS 292.480(1).

## COUNT II: VIOLATION OF KRS 292.340 — SALE OF UNREGISTERED SECURITIES

*(Against Barker, Kennedy, Zheng, Lighthouse Estates LLC, and Starpoint Holdings LLC)*

192. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated.

193. KRS 292.340 provides that "[i]t is unlawful for any person to offer or sell any security in this state, unless the security is registered under this chapter, or the security or transaction is exempt under this chapter, or the security is a covered security."

194. The PML notes are securities within the meaning of the Kentucky Securities Act. The PML notes were not registered with the Kentucky Department of Financial Institutions. Upon information and belief, no exemption from registration applies.

195. There is no requirement that the seller act with fraud or scienter to establish a violation of KRS 292.340.

196. Plaintiffs have alleged all three elements: the PML notes are securities, the notes were not registered, and upon information and belief, no exemption applies. Defendants bear the burden of proving any applicable exemption, which they cannot do here because the notes were offered to the general public in a widespread solicitation campaign.

197. Each Defendant who participated in the offer or sale of the unregistered PML notes is liable under KRS 292.480(1) and (4) for the consideration paid by Plaintiff and the class.

## COUNT III: CONTROL PERSON AND SECONDARY LIABILITY UNDER KRS 292.480(4)

*(Against All Defendants)*

198. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated.

199. KRS 292.480(4) provides that every person who directly or indirectly controls a seller or purchaser liable under subsection (1) or (2), and every partner, officer, or director (or person occupying a similar status or performing similar functions) or employee of such seller who materially aids in the sale, is liable jointly and severally with and to the same extent as the seller.

200. "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise."

201. Kentucky's Blue Sky law is modeled on the Uniform Securities Act and is construed in harmony with federal securities law.

202. Under the Uniform Securities Act, partners, officers, and directors of a seller are strictly liable to purchasers of unregistered securities regardless of whether the partner, officer, or director materially aided in the sale — the "materially aids" clause modifies only "employee."

203. The sole statutory defense for non-sellers is to prove "that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist." KRS 292.480(4).

### A. Control Person

204. **Van Laurence Barker.** Barker directly controlled Lighthouse Estates LLC, Starpoint Holdings LLC, and all affiliated entities. Barker admitted "I control all the factors." Barker conceived and directed the scheme, including all aspects of operations, capital flows,

property acquisitions, and the deal-recycling mechanism. Every decision regarding the PML scheme flowed through Barker, making him a control person within the meaning of KRS 292.480(4).

### **B. Partners, Officers, Directors, and Persons Occupying Similar Status or Performing Similar Functions**

205. **Joshua James Kennedy.** Kennedy is a member of both Lighthouse Estates LLC and Starpoint Holdings LLC and a co-founder of the enterprise with Barker. Kennedy admitted to "establishing this business back in late 2023" with Barker and to "developing" the "Swap System."

206. As a member of the primary selling entity (Lighthouse) and of Starpoint, Kennedy occupied a similar status to and performed similar functions as an officer or director of both sellers. Kennedy exercised “control” within the statutory definition because he possessed “the power to direct or cause the direction of the management and policies” of both Lighthouse Estates LLC and Starpoint Holdings LLC through his membership interests and operational role.

207. Kennedy’s admission that he “helped van Barker establish this business back in late 2023” and “developed” the “Swap System” establishes that he directed the fundamental business model and policies of the enterprise.

208. Kennedy cannot carry the burden of proving he “did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist,” as he admitted knowledge of the Ponzi mechanics in his signed letter and January 2026 meeting statements.

209. **Siyuan Zheng.** Zheng is a member and registered agent of Lighthouse Estates LLC. Zheng resided at the same address as Lighthouse’s principal office (5720 Brown Ave. #B, Fort Knox, KY). Zheng attended the January 2026 post-arrest investor meeting and communicated with investors regarding the scheme.

210. As a member and registered agent of the primary selling entity, Zheng occupied a similar status to and performed similar functions as an officer or director of Lighthouse. Following Barker's incarceration, Zheng is the Lighthouse member with the most direct access to entity financial records, banking relationships, and remaining assets, giving her actual power to direct the entity's remaining operations and asset disposition.

211. Zheng cannot carry the statutory defense burden because her status as member, registered agent, and spouse of the principal operator establishes that she knew or should have known of the facts giving rise to liability.

**C. Agents Who Materially Aided in the Sale**

212. **Marcia Donaldson.** Donaldson served as the primary investor-facing intermediary for a cohort of PMLs. Donaldson actively solicited PML investments, distributed marketing materials, conducted introductory calls, facilitated execution of promissory notes, and coordinated with title companies. Donaldson — through her solicitation activities, preparation of transaction documents, and role as point of contact with investors — effected and attempted to effect the purchase and sale of securities on behalf of the issuers. Her actions went far beyond ministerial tasks. Donaldson was the primary mechanism through which PMLs were brought into the scheme, making her an agent who materially aided in the sale.

213. **Joshua James Kennedy and Starpoint Holdings LLC.** Kennedy personally facilitated the scheme by helping establish the business and developing the recycling system. Starpoint was the named sender of the "Takedown Play" email to Aaron Metten and Eric Payne describing the fund-cycling strategy.

214. Starpoint received recurring $5,000 "assistance" fees from many PML transactions, giving Starpoint direct financial benefit from the sales. Both Kennedy and Starpoint materially aided in the sale by participating in the solicitation infrastructure and fund-cycling operations.

### C. Non-Party Participants — Additional Individuals Whose Control Person, Officer/Director, and Agent Liability Is Established by the Record

215. The following paragraphs describe additional individuals who satisfy the statutory categories of KRS 292.480(4) and whose conduct was integral to the scheme's operation. These individuals are described here to establish the full scope of the scheme, to demonstrate the coordinated nature of the enterprise, and to preserve claims that may be asserted against them at a later stage of this litigation or in supplemental proceedings.

216. Their inclusion also demonstrates that the named Defendants operated as part of a larger enterprise and could not have executed the scheme without the participation of these additional control persons, officers, directors, and agents.

217. **Ronnie J. Harris Jr.** Harris directly or indirectly controlled the institutional infrastructure that enabled the scheme. Through King Harris Bancorp Inc., Harris controlled Peoples Bank, which provided the warehouse line of credit that funded KPL's lending operations and the entire capital-cycling structure.

218. Through Bear Capital LLC, Harris received $5,000 per transaction from every PML closing. Harris's dual-control position gave him the power to direct the management and policies of both the banking infrastructure and the private lending operation.

219. Harris was a board member of Peoples Bank, President of King Harris Bancorp, and a member of Bear Capital and 928 Properties LLC.

220. **Aaron Metten.** Metten is President and managing member of KPL. Metten possessed the power to direct the management and policies of KPL, which originated and serviced

the senior hard-money loans on Lighthouse properties that were structurally linked to the PML recycling mechanism. Metten admitted the portfolio was "underwater" with a 60% loss and proposed continuing the Ponzi by recruiting new investors. As President and managing member, Metten was an officer, director, and control person of KPL. (KPL Meeting Tr. at 26–28.)

221. **Eric Payne.** Payne served as Managing Partner of KPL and held a member interest in KYPL Holdings I LLC, giving him direct control over KPL's origination and servicing of the senior hard-money loans that were structurally linked to the PML recycling mechanism. Payne was a named recipient of the "Takedown Play" email, establishing his knowledge of the fund-cycling strategy.

222. As Managing Partner, Payne was a partner, officer, or person occupying a similar status to an officer or director of the seller. (Ex. N, KPL Pitch Deck at 1.)

223. **Maria Bock.** Bock served as a transaction coordinator managing a separate cohort of PML investors through Buena Vida Consulting and The Bock Group LLC.

224. Bock actively solicited investments, facilitated note execution, and served as the primary contact for her investors. Bock effected and attempted to effect the sale of securities on behalf of issuers, making her an agent who materially aided in the sale.

225. Each named Defendant cannot carry the burden of proving that he or she did not know, and in the exercise of reasonable care could not have known, of the facts giving rise to liability under KRS 292.480(4).

226. All named Defendants were active participants in, direct beneficiaries of, or standing members/officers/directors of the entity structure through which the scheme operated. Knowledge and participation are established through their own admissions, their roles in the enterprise, their direct financial benefits, and the coordinated nature of the scheme.

227. Plaintiffs and the class are entitled to recover from all named Defendants jointly and severally under KRS 292.480(4), holding each liable to the same extent as the sellers of the unregistered securities.

## COUNT IV: COMMON LAW FRAUD

*(Against Barker, Kennedy, Lighthouse Estates LLC, and Starpoint Holdings LLC)*

228. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated.

### A. Van Laurence Barker and Lighthouse Estates LLC

229. **Who:** Barker, the principal owner and operator of Lighthouse Estates LLC, and Lighthouse as the primary operating entity through which the scheme was conducted.

230. **What:** Barker and Lighthouse represented to PML investors that their funds would be used for specific property acquisitions and rehabilitations; that the properties were worth the amounts stated in the transaction documents; that PMLs held first-position secured liens on the properties; that lender's title insurance would be provided; and that returns of 15% to 19% over three to six months would be generated by the profitable acquisition, rehabilitation, and sale of real property. Each of these representations was false. PML funds were used to pay prior PML obligations, not for property rehabilitation. Barker admitted "we don't do really any refurb." The properties were worth "30 to 50 cents on every dollar" of the outstanding debt. The liens were encumbered by Peoples Bank's blanket UCC-1 security interest. Returns were generated by new investor capital in a Ponzi scheme, not by profitable real estate operations.

231. **When:** Throughout the period from late 2023 through the present. Barker admitted the scheme's mechanics at the October 2025 Angels Meeting, stating: "We basically do refreshes

of the loan by swapping out private lenders," "deal recycling work is really you're just taking money and funding cash to close," "we don't do really any refurb," and "I control all the factors."

232. **Where:** The scheme was conceived, directed, and operated from Kentucky. Lighthouse's principal office was located at 5720B Brown Ave, Unit B, Fort Knox, Kentucky. Barker directed capital flows through Peoples Bank (Kentucky) and True Title, and used offshore entities in Thailand and the Philippines to redirect scheme proceeds.

233. **How:** Barker and Lighthouse perpetrated the fraud through: (a) promissory notes and joint venture agreements representing that funds would be used for specific properties; (b) settlement statements that were systematically falsified to conceal the recycling of PML capital; (c) marketing materials and transaction documents distributed through Donaldson and Bock touting fixed returns; (d) the elimination of independent appraisals, staged rehabilitation draws, and third-party inspections through Harris's dual-control position; and (e) the "deal recycling" or "Swap System" through which new investor money was used to create the illusion that prior investments were performing.

**B. Joshua James Kennedy and Starpoint Holdings LLC**

234. **Who:** Kennedy, co-founder of the enterprise with Barker, member of both Lighthouse Estates LLC and Starpoint Holdings LLC; and Starpoint, the entity through which Kennedy participated in and profited from the scheme.

235. **What:** Kennedy co-developed the "Swap System" — the core mechanism of the Ponzi scheme — and was involved in the "Takedown Play" email describing the fund-cycling strategy to Aaron Metten and Eric Payne (Starpoint was the named sender). Kennedy personally signed the promissory note on the 3110 Prairie transaction (Ex. I) and the personal guarantee on the 1941 W. 10th Place transaction (attached as Exhibit "S", 1941 W. 10th Place Gary Personal

Guarantee), representing that the investments were legitimate. The 3110 Prairie guarantee (Ex. J) was executed by Barker, Kennedy, and Ariel Barker on separately notarized signature pages. Kennedy signed a letter admitting that "a temporary system evolved where KPL and PML loans were effectively recycled internally" and that "the model became unsustainable." Starpoint received recurring $5,000 "assistance" fees from many PML transactions despite providing no legitimate services.

236. **When:** Kennedy admitted he "helped van Barker establish this business back in late 2023." The "Takedown Play" email was sent during the scheme’s operation. At the January 2026 meeting, Kennedy stated: "It led to a system being created where funds were being rolled over. The rehab fund started being used to keep paying back notes, and then keep notes going forward. A Swap System of sorts was developed." Kennedy acknowledged: "Whatever system we were doing, there was no runway to keep it going much longer."

237. **Where:** Kennedy operated from Kentucky throughout the relevant period, co-founding and operating the enterprise from the Commonwealth. Starpoint Holdings LLC, though an Indiana entity, conducted all scheme-related operations from Kentucky.

238. **How:** Kennedy perpetrated the fraud through: (a) co-developing the "Swap System" that was the operational mechanism of the Ponzi scheme; (b) participating in the "Takedown Play" email (sent by Starpoint) that provided the operational blueprint for the fund-cycling strategy; (c) signing the promissory note on the 3110 Prairie transaction (Ex. I) and the personal guarantee on the 1941 W. 10th Place transaction (Ex. S), and being named as a guarantor on the 3110 Prairie guarantee (Ex. J); (d) extracting recurring $5,000 "assistance" fees through Starpoint from many PML transactions; and (e) participating in operational and rehabilitation oversight while knowing no rehabilitation was being performed.

**D. Reliance, Causation, and Injury (All Defendants)**

239. **Reliance.** Plaintiffs and the class relied on Defendants' representations in making their investments. Simaya relied on settlement statements representing that its funds would be used to acquire and rehabilitate specific properties — settlement statements that were systematically falsified to conceal the recycling of PML capital. Plaintiffs relied on representations that their investments were secured by first-position liens — liens that either did not exist (as at 5088 Queens Avenue, where no mortgage was recorded) or were encumbered by Peoples Bank's blanket UCC-1 security interest.

240. Plaintiffs relied on Donaldson's representations during introductory calls that the investments were safe and that she would "pay you myself if this goes sideways."

241. Plaintiffs relied on photographic documentation of rehabilitation work — photographs that were reused across properties and did not reflect actual work performed. Plaintiffs relied on representations that lender's title insurance would be provided — insurance documentation that was fabricated, as at 4120 10th Avenue, Birmingham. Simaya would not have invested $365,000 across four transactions had Plaintiffs known that Defendants were operating a Ponzi scheme, that no rehabilitation was being performed, that properties were worth "30 to 50 cents on every dollar" of the debt, and that Simaya's funds were being used to pay prior investors. Each class member relied on the same types of misrepresentations.

242. **Causation and Injury.** Defendants' misrepresentations directly and proximately caused Plaintiffs and the class to invest their funds, and those funds have been lost or are at immediate risk of loss. The class has suffered damages estimated at $24 million or more. "Families

have lost life savings, retirement and IRA funds have been wiped out, businesses have collapsed, and many victims are now facing severe financial hardship."

## COUNT V: UNJUST ENRICHMENT

*(Against All Defendants, in the Alternative)*

243. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated.

244. This Count is pleaded in the alternative to Counts I through IV and Count VI, as permitted by Federal Rule of Civil Procedure 8(d)(2).

245. Under Kentucky law, unjust enrichment requires proof of three elements: (1) benefit conferred upon defendant at plaintiff's expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value. The equitable doctrine of unjust enrichment "is applicable as a basis of restitution to prevent one person from keeping money or benefits belonging to another."

246. **Benefit conferred.** Plaintiffs and the class conferred substantial monetary benefits on each Defendant by investing approximately $24 million in PML capital.

247. Those funds flowed directly to and through each Defendant: Lighthouse Estates LLC received all PML capital as the primary operating entity; Barker extracted management fees, "cash to borrower" payments, and recurring extraction fees at every cycle of the scheme, and diverted PML funds to personal accounts, offshore entities, and at least sixteen affiliated entities; Kennedy and Starpoint Holdings LLC received recurring $5,000 "assistance" fees from many PML transactions and additional origination and servicing fees; Donaldson received commissions for soliciting PML investments; and Zheng, as a member and registered agent of Lighthouse, accessed and moved PML funds after Barker's arrest.

248. **Appreciation of benefit.** Each Defendant appreciated the benefit of the PML funds. Barker used investor funds to sustain personal expenditures, fund offshore operations, and cycle properties through affiliated entities to generate repetitive fees. Kennedy and Starpoint profited directly from per-transaction fees. Donaldson profited through commissions. Lighthouse received and deployed the entirety of the PML capital. Zheng had access to and exercised control over PML funds after Barker's incarceration.

249. **Inequitable retention.** Each Defendant retains the benefits of the PML funds without having paid their value. The PML class has received neither the promised returns nor the return of principal. The properties securing the notes are worth "30 to 50 cents on every dollar" of the outstanding debt. Defendants operated a Ponzi scheme that used new investor capital to pay prior obligations, and the class's funds have been dissipated through the scheme rather than applied to their intended purpose. It would be unconscionable to permit Defendants to retain the benefits of these funds.

250. Defendants received benefits far beyond those contemplated by the promissory notes and transaction documents, including: management fees on vacant and uninhabitable properties where no management was performed; rehabilitation draws for work that was never completed; "cash to borrower" payments far in excess of any legitimate rehabilitation or acquisition expense; recurring $5,000 "assistance" fees paid to Starpoint, Bear Capital, and other affiliated entities for nonexistent services; and the use of PML capital as operating funds for Barker's personal expenditures, offshore operations, and the at least sixteen affiliated entities through which he cycled scheme proceeds. These benefits were obtained through fraud and have no contractual justification.

251. In Ponzi scheme cases, courts have consistently held that defendants who received net gains from investor funds are liable for unjust enrichment and must disgorge those profits. Each Defendant here received substantial benefits from the $24 million in PML capital at the expense of the investor class, and equity requires disgorgement of those benefits.

252. To the extent that Plaintiffs' statutory or contractual remedies are determined to be unavailable, inadequate, or inapplicable, Plaintiffs and the class are entitled to restitution of all benefits unjustly retained by Defendants, together with such equitable relief as the Court deems necessary to prevent Defendants' continued unjust enrichment, including the appointment of a receiver and the imposition of a constructive trust over Defendants' assets for the benefit of the class.

## COUNT VI: BREACH OF CONTRACT

*(Against Lighthouse Estates LLC and Barker)*

253. Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully restated.

254. Under Kentucky law, a breach of contract claim requires proof of three elements: "(1) existence of a contract; (2) breach of that contract; and (3) damages flowing from the breach of contract."

### A. 1941 W. 10th Place, Gary, Indiana — $105,000

255. **Contract.** Simaya entered into a joint venture agreement dated February 25, 2025, investing $105,000 in the property at 1941 W. 10th Place, Gary, Indiana 46404. The agreement had a maturity date of August 24, 2025. The borrower was Lighthouse Estates LLC. Kennedy signed the personal guarantee on this transaction. (Ex. O, JV Agreement; Ex. S, Personal Guarantee.)

256. **Breach.** Lighthouse and Barker breached this agreement by diverting Simaya's funds from the stated purpose. The purported "repayment" of $126,787.50 in October 2025 was not funded from property sale proceeds or legitimate business income but from new PML capital invested by Neelema Sinha — a textbook Ponzi payment. Defendants further breached by failing to use the funds for the property acquisition and rehabilitation described in the agreement, failing to provide the first-position lien and lender's title insurance promised, and by operating the property as part of the Ponzi scheme rather than as the legitimate investment represented.

257. **Damages.** $105,000 in principal, plus accrued contractual interest from the maturity date. The "repayment" was illusory — funded by Ponzi proceeds, not legitimate returns — and Plaintiffs are entitled to recover the full consideration paid.

**B. 1156 Van Buren Street, Gary, Indiana — $95,000**

258. **Contract.** Simaya initially funded $45,000 under a funding agreement dated August 8, 2025 (Ex. A), which was increased to $95,000 by addendum effective August 22, 2025 (Ex. B).

259. The borrower on this transaction was CeeKou LLC, a Wyoming limited liability company whose members are Siyuan Zheng (81%) and Lighthouse Estates LLC (19%) (Ex. L, CeeKou LLC Operating Agreement) — not Lighthouse Estates LLC. The promissory note (Ex. C) identifies CeeKou LLC as the borrower, but the signature block was executed by "Lighthouse Estates LLC, a Kentucky Limited Liability company by Van Barker," with Siyuan Zheng signing as "Duly Authorized Member." Barker signed the personal guarantee on behalf of Lighthouse Estates LLC (Ex. D); Zheng co-signed the guarantee.

260. **Breach.** The accounting ledger confirms that Simaya deposited the full $95,000, but $113,209.67 was paid to KPL as a loan payoff — meaning Simaya's funds were used to retire

a prior KPL obligation rather than to acquire and rehabilitate the property as represented. Zero payments have been made to Simaya. The note is in default. Barker, as the controlling person of both CeeKou LLC and the Lighthouse enterprise, directed the diversion of these funds.

261. **Damages.** $95,000 in unpaid principal, plus accrued contractual interest from the date of default.

**C. 210 N. 26th Street, Louisville, Kentucky — $65,000**

262. **Contract.** Simaya entered into a joint venture agreement investing $65,000 in the property at 210 N. 26th Street, Louisville, Kentucky 40212, with a maturity date of September 11, 2025. Simaya was the co-lender alongside Hidden Gems Ventures LLC, which invested $13,000 on the same property. The borrower was Lighthouse Estates LLC. Barker signed the promissory note (Ex. F). The personal guarantee (Ex. G) was executed by Barker, Kennedy, and Ariel Mermelshtayn Barker on separately notarized signature pages. (Ex. E; attached as Exhibit "T", 210 N. 26th St., Louisville ALTA Settlement Statement.)

263. **Breach.** Lighthouse and Barker breached this agreement by failing to make any payments of principal or interest. The note is past maturity and in default. Defendants diverted PML funds from the stated purposes, failed to rehabilitate the property as represented, and failed to provide the first-position lien and lender's title insurance promised.

264. **Damages.** $65,000 in unpaid principal, plus accrued contractual interest from the maturity date.

**D. 3110 Prairie Avenue, St. Louis, Missouri — $100,000**

265. **Contract.** Simaya entered into a joint venture agreement investing $100,000 in the property at 3110 Prairie Avenue, St. Louis, Missouri 63107, with a maturity date of November 6, 2025. The borrower was Lighthouse Estates LLC. Kennedy signed the promissory note (Ex. I).

The personal guarantee (Ex. J) was executed by Barker, Kennedy, and Ariel Barker on separately notarized signature pages. (Ex. H; attached as Exhibit "U", 3110 Prairie Ave. ALTA Settlement Statement.)

266. **Breach.** Lighthouse and Barker breached this agreement by failing to make any payments of principal or interest. The note is past maturity and in default. Defendants diverted PML funds from the stated purposes, failed to rehabilitate the property as represented, and failed to provide the first-position lien and lender's title insurance promised.

267. **Damages.** $100,000 in unpaid principal, plus accrued contractual interest from the maturity date.

**E. Class-Wide Breach Allegations**

268. **Existence of contracts.** Each PML investor executed a promissory note with Lighthouse Estates LLC (or, in some cases, an affiliated entity controlled by Barker) in connection with his or her PML investment. The promissory notes are valid, enforceable contracts. Each note specified: the principal amount of the investment; the interest rate and payment schedule; the maturity date; and the property securing the investment. The notes were supported by consideration: the PML investors advanced their capital and Lighthouse promised to repay principal with interest.

269. **Breach.** Lighthouse Estates LLC and Barker breached the promissory notes in multiple respects: (a) they failed to pay the promised returns to PML investors; (b) they failed to return principal at maturity; (c) they diverted PML funds from the purposes specified in the notes and transaction documents, using investor capital to pay prior PML obligations, fund personal expenditures, and cycle through affiliated entities rather than acquiring and rehabilitating the designated properties; (d) they failed to secure the first-position liens promised to investors, as

the properties were encumbered by Peoples Bank's blanket UCC-1 security interest and other competing claims; (e) they failed to provide the lender's title insurance policies promised in the transaction documents; and (f) Lighthouse has ceased all operations and is unable to perform any of its remaining obligations under the notes.

270. **Damages.** Plaintiffs and the class have suffered damages as a direct and proximate result of these breaches. The damages include the unpaid principal balance of each promissory note, unpaid accrued interest, and consequential damages flowing from Defendants' breach, including the loss of the security interest that was promised but never delivered. Simaya invested $365,000 in capital across four PML transactions. Three of those investments — totaling $260,000 in principal — remain entirely unpaid and in default. The fourth was nominally "repaid" using Ponzi proceeds recycled from a subsequent investor. The class's aggregate damages exceed $24 million in principal alone. (Exs. A–U.)

271. Plaintiffs and the class are entitled to recover the full amount of damages caused by Lighthouse Estates LLC's and Barker's breach of the promissory notes, including unpaid principal, accrued contractual interest, and such other damages as the Court may find appropriate.

## IX. REQUEST FOR APPOINTMENT OF RECEIVER

272. Plaintiffs request that this Court exercise its broad equitable powers to appoint a receiver over Lighthouse Estates LLC, Starpoint Holdings LLC, and all assets owned or controlled by Van Laurence Barker, whether held individually, jointly, or through any entity, trust, or nominee. Federal district courts "enjoy broad equitable powers to appoint a receiver over assets disputed in litigation before the court." *Liberte Capital Group, LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006). "The receiver's role, and the district court's purpose in the appointment, is to

safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary." Id. at 551.

273. The Securities Act of 1933 "does not restrict purchasers seeking relief under its provisions to a money judgment," but rather permits "legal or equitable actions or procedures as would normally be available to a litigant." *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 288 (1940). This principle extends to state securities claims enforced in federal court.

274. While receivership is "an extraordinary remedy that a court should employ with the utmost caution," the factors for appointment are satisfied here. *Pension Benefit Guaranty Corp. v. Evans Tempcon, Inc.*, 630 F. App'x 410, 419 (6th Cir. 2015)

275. Courts consider "whether the property at issue is in imminent danger of being lost, concealed, injured, diminished in value, or squandered," "whether the defendant engaged in fraudulent conduct," "the inadequacy of the available legal remedies," "the lack of less drastic equitable remedies," and "the likelihood that the appointment will do more good than harm." Id. at 419.

276. Each factor weighs in favor of receivership:

a. **Imminent danger of loss or dissipation.** Defendants have admitted that the 270 properties are worth a fraction of the approximately $60 million in outstanding debt. Defendants have a demonstrated pattern of transferring assets between affiliated entities, diverting PML funds to personal use, and using offshore entities—including Estella Management in Thailand and Spain De Los Reyes in the Philippines—to redirect rental income and manage finances. Peoples Bank's blanket UCC-1 lien threatens to sweep assets that should be preserved for the PML class. Van Barker, the principal architect of the scheme, is now incarcerated on federal criminal charges and unable to manage or direct the enterprise. Barker's incarceration creates a

dangerous management vacuum. Without a receiver over Barker's personal assets and the entities he controlled, there is an imminent risk that scheme proceeds already diverted to personal accounts, offshore entities, family-controlled vehicles, and the at least sixteen affiliated entities through which Barker operated will be dissipated beyond recovery.

b. **Fraudulent conduct.** Defendants operated a Ponzi scheme, as admitted by their own principals. Barker admitted to "deal recycling" and performing "no refurb." Kennedy admitted to the "Swap System" and signed a letter acknowledging the model "became unsustainable" and that loans were "effectively recycled internally." (Ex. R, Kennedy Letter at 1–2.) Metten admitted the portfolio is "underwater" with a 60% loss. Donaldson fabricated closing documents and insurance documentation. Settlement statements were systematically falsified. The "Takedown Play" email confirms the intentional design of the fund-cycling strategy. Barker's federal criminal charges for distributing child sexual abuse material demonstrate a broader pattern of concealment and deception, using VPNs and multiple accounts to hide criminal conduct, just as he used affiliated entities and falsified statements to conceal the Ponzi scheme.

c. **Inadequacy of legal remedies.** A money judgment alone would be inadequate because Defendants are insolvent, the assets are being dissipated, and absent a receiver, there is no mechanism to prevent further loss, manage 270 unmanaged properties, investigate the full scope of the fraud, or achieve an equitable distribution among the 125+ PMLs.

d. **Lack of less drastic remedies.** No lesser remedy can address the ongoing dissipation, the management vacuum created by Barker's incarceration, and the competing claims on the assets. A restraining order has already been entered in a related proceeding, yet the properties continue to deteriorate. A receiver is the only mechanism that can take control of the properties, prevent further transfers, and maximize value for the class.

e. **More good than harm.** The appointment of a receiver will preserve assets for the benefit of all creditors, impose professional management on a portfolio that Defendants have admitted they cannot manage, and prevent the further deterioration of 270 properties that are currently unmanaged. As Metten himself proposed bringing in new management and consolidating debts, the appointment of a court-supervised receiver achieves this goal without the conflicts of interest inherent in allowing the perpetrators of the fraud to manage the recovery.

**<u>Immediate Need for Receivership — Imminent Dissipation of Assets</u>**

277. The need for immediate judicial intervention is urgent. The following specific facts establish that scheme assets are at imminent risk of dissipation, deterioration, or loss beyond recovery:

278. First, Barker is incarcerated on federal criminal charges and cannot manage, protect, or preserve the 270 properties in the portfolio or any other scheme assets. The management vacuum created by his arrest leaves the assets without oversight or protection.

279. Second, the 270 properties are deteriorating without professional management. Metten admitted that the portfolio would suffer "a 60% loss if we sold everything as is." Every day without active management and preservation reduces the recovery available to the class.

280. Third, rental income from Lighthouse-owned properties has been diverted to offshore entities: Estella Management in Thailand and Spain De Los Reyes in the Philippines. These entities are beyond the reach of domestic process, and the income streams have not been accounted for or redirected to creditors.

281. Fourth, Peoples Bank’s blanket UCC-1 lien on all KPL assets threatens to sweep properties and proceeds that should be preserved for the PML class. Without a receiver to assert the class’s interests, Peoples Bank’s secured claim could consume the remaining asset value.

282. Fifth, no accounting has been provided of the total fees extracted by Starpoint Holdings LLC, Bear Capital LLC, Kennedy personally, or any of the other affiliated entities over the life of the scheme. The amount of PML capital diverted to these entities remains unknown.

283. Sixth, Barker family members retain access to scheme assets. Zheng, as a member and registered agent of Lighthouse, has direct access to the entity's financial records, bank accounts, and remaining assets. Curran Barker communicated that investors were "looking at the wrong side of the equation" and that there were "deeper pockets elsewhere" — suggesting a coordinated effort to deflect scrutiny while retaining control.

284. Seventh, at least sixteen affiliated entities controlled by Barker remain unaccounted for. Assets, properties, and funds cycled through these entities have not been traced, frozen, or marshaled. Without a receiver empowered to investigate the full entity web, scheme proceeds will remain dispersed and unrecoverable.

285. Eighth, at the January 2026 meeting, Metten proposed that PMLs accept "write-downs" and that new PMLs be recruited to inject additional capital — in essence, a proposal to continue the Ponzi scheme under a new structure. This proposal demonstrates that, absent judicial oversight, the individuals who operated the scheme would continue to operate it.

**Justification for Personal-Asset Receivership Over Van Laurence Barker**

286. A receivership over Barker's personal assets is warranted because Barker personally directed the diversion of PML funds, positioned himself as the "orchestrator of capital flows," personally controlled the movement of millions of dollars in pooled investor funds through Peoples Bank and True Title, operated at least sixteen affiliated entities through which properties and funds were recycled, and used offshore entities (Estella Management in Thailand, Spain De

Los Reyes in the Philippines) to redirect rental income beyond the reach of domestic creditors. Barker admitted that he "control[s] all the factors."

287. Barker generated repetitive extraction fees at every cycle of the scheme, including substantial "cash to borrower" payments "far in excess of what would be expected in a legitimate fix-and-flip transaction."

288. Barker is now incarcerated on federal criminal charges and unable to manage or protect any assets for the benefit of the class. A receiver is necessary to locate, freeze, and marshal all assets in Barker's name or under his control, including those held through family members, entities, trusts, or nominees.

289. Without a receiver, the at least sixteen affiliated entities through which Barker operated, the offshore entities to which he directed income, and any personal accounts into which scheme proceeds were diverted will remain beyond the reach of the class.

290. The scope of the personal-asset receivership reflects the scope of Barker's personal control: because Barker personally directed the scheme and personally controlled the flow of funds, the receiver must be empowered to trace and recover those funds wherever Barker directed them.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the class, respectfully request that this Court enter judgment against Defendants and grant the following relief:

(a) Certify this action as a class action under Federal Rule of Civil Procedure 23(a) and 23(b)(3), appoint Crystal Cervantez-Tkac and Simaya Innovations LLC as Class Representatives, and appoint Loftus & Eisenberg, Ltd. as Class Counsel;

(b) Appoint an equity receiver over Lighthouse Estates LLC, Starpoint Holdings LLC, and all assets owned or controlled by Van Laurence Barker, whether held individually, jointly, or through any entity, trust, or nominee, with authority to take immediate custody and control of all such assets, prevent further dissipation, manage and liquidate properties for the benefit of the class, investigate and pursue claims on behalf of the receivership estates, and make equitable distributions to class members;

(c) Enter a temporary restraining order and preliminary injunction freezing the assets of all Defendants, Lighthouse Estates LLC, Starpoint Holdings LLC, and Van Laurence Barker (including all entities owned or controlled by Barker), pending the appointment of a receiver;

(d) Award Plaintiffs and the class rescission and recovery of the full consideration paid for the PML notes, together with interest at six percent per year from the date of each payment, less any income received, as provided by KRS 292.480(1);

(e) Enter judgment against all Defendants jointly and severally, as control persons, partners, officers, directors, persons occupying similar status, and agents who materially aided the sale of securities, under KRS 292.480(4);

(f) Award Plaintiffs and the class compensatory damages for all losses caused by Defendants' common law fraud, in an amount to be determined at trial;

(g) In the alternative, award Plaintiffs and the class restitution of all benefits unjustly retained by Defendants, and impose a constructive trust over Defendants' assets for the benefit of the class;

(h) Award Plaintiffs and the class the full unpaid principal balance of each promissory note, together with accrued contractual interest and consequential damages, for Lighthouse Estates LLC's and Barker's breach of the promissory notes;

(i) Award Plaintiffs and the class punitive damages for Defendants' willful, wanton, and malicious conduct;

(j) Award Plaintiffs and the class their reasonable attorneys' fees and costs of suit, as provided by law;

(k) Award pre-judgment and post-judgment interest at the maximum rate permitted by law; and

(l) Grant such other and further relief as this Court deems just and proper.

## XI. JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

By:

Alexander N. Loftus, Esq.
(Pro Hac Vice Applied For)
**LOFTUS & EISENBERG, LTD.**
181 W. Madison Street, Suite 4700
Chicago, Illinois 60602
(312) 899-6625
alex@loftusandeisenberg.com

**MICHELE HENRY LAW, P.C.**
Michele Henry, Esq.
517 W Ormsby Ave,
Louisville, KY 40203
(502)536.0085
mhenry@michelehenrylaw.com
*Counsel for Plaintiffs and the Proposed Class*