**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| CRYSTAL CERVANTEZ-TKAC, et al., individually and on behalf of all others similarly situated, | ) ) ) ) |
| | ) Case No. 3:26-cv-00280-CHB |
| Plaintiffs, | ) |
| | ) |
| v. | ) Chief Judge Claria Horn Boom |
| | ) |
| VAN LAURENCE BARKER; JOSHUA JAMES KENNEDY; SIYUAN ZHENG; LIGHTHOUSE ESTATES LLC; and STARPOINT HOLDINGS LLC, | ) ) ) ) |
| | ) |
| Defendants. | ) |

**PLAINTIFFS' MOTION FOR APPOINTMENT OF AN EQUITY RECEIVER AND INCORPORATED MEMORANDUM IN SUPPORT**

Alexander N. Loftus, Esq.
*(pro hac vice pending)*
LOFTUS & EISENBERG, LTD.
181 W. Madison Street, Suite 4700
Chicago, Illinois 60602
Telephone: (312) 899-6625
alex@loftusandeisenberg.com

Michele D. Henry, Esq.
MICHELE D. HENRY LAW, P.C.
517 W. Ormsby Avenue
Louisville, Kentucky 40203
Telephone: (502) 536-0085
mhenry@michelehenrylaw.com

*Counsel for Plaintiffs and Proposed Class*

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................... 1

BACKGROUND ......................................................................................................................... 3

A.  The Lighthouse enterprise, the PML class, and the post-arrest
    management vacuum. ........................................................................................................ 3

B.  Defendants' own admissions that the enterprise operated as a Ponzi-
    style recycling scheme. .................................................................................................... 4

C.  Documentary concealment; corporate architecture; and the post-
    exposure proposal to continue the scheme. ..................................................................... 7

D.  The parallel E.D.N.Y. SummitBridge TRO. .................................................................... 8

LEGAL STANDARD ................................................................................................................. 8

ARGUMENT ............................................................................................................................... 9

I.   THE *EVANS TEMPCON* AND *PNC BANK FACTORS* BOTH
     COMPEL APPOINTMENT. ............................................................................................ 9

A.  The enterprise's remaining assets are in imminent danger of
    dissipation. ...................................................................................................................... 10

B.  Defendants have admitted fraudulent conduct in their own words. ................................ 11

C.  Legal remedies are inadequate, no less drastic equitable remedy will
    work, and the balance of harms favors appointment. ..................................................... 12

D.  Each of the Four Remaining PNC Bank Factors—Security, Financial
    Position, Probable Success, and Investor Interests—Independently
    Confirms Appointment Is Warranted. ............................................................................ 13

E.  The absence of advance contractual consent is not disqualifying. ................................. 14

F.  Grayiel is distinguishable on every dispositive fact. ..................................................... 15

II.  THE RECEIVERSHIP SHOULD EXTEND TO AFFILIATED
     ENTITIES AND TO TRACEABLE PERSONAL ASSETS. ........................................... 15

A.  Seventeen-plus affiliated entities should be included as instruments of
    the enterprise under Kentucky alter-ego law. ................................................................ 15

B.  Individual-defendant assets traceable to PML funds should be included
    via constructive trust; foreign affiliates via authorized ancillary
    proceedings. .................................................................................................................... 17

III. THE PARALLEL E.D.N.Y. LITIGATION CORROBORATES—
     AND DOES NOT DISPLACE—THE NEED FOR THIS
     RECEIVERSHIP. ........................................................................................................... 17

IV.  THE PROPOSED RECEIVER IS QUALIFIED, INDEPENDENT,
     AND PREPARED TO SERVE. ....................................................................................... 18

RELIEF REQUESTED ............................................................................................................. 20

CONCLUSION .......................................................................................................................... 21

## TABLE OF CASES

*Burke & Herbert Bank & Trust Co. v. Bare Arms LLC*, No. 0:26-cv-00032-DLB-EBA (E.D. Ky. Mar. 10, 2026) (R. & R.), adopted, ECF No. 21 (Mar. 27, 2026) ..................................................................*passim*

*CNH Capital Am. LLC v. Hunter Tractor & Equip., Inc.*, 568 F. App'x 461 (6th Cir. 2014) ................................................................. 16

*Davis v. Davis*, 489 S.W.3d 225 (Ky. 2016) ............................... 17

*Digital Media Solutions, LLC v. S. Univ. of Ohio, LLC*, 59 F.4th 772 (6th Cir. 2023) .................................................................. 8, 15

*Embry v. Discount Motors, LLC*, No. 4:23-cv-00078 (W.D. Ky. Jan. 22, 2026) .......................................................................... 10

*Grayiel v. AIO Holdings, LLC*, No. 3:15-CV-821-CHB, 2023 WL 5281933 (W.D. Ky. Aug. 16, 2023) ........................................................*passim*

*Hodak v. Madison Capital Mgmt., LLC*, 348 F. App'x 83 (6th Cir. 2009) .............................. 16

*Holt v. Griffin*, 865 F.3d 417 (6th Cir. 2017) ........................................ 11

*Keeney v. Keeney*, 223 S.W.3d 843 (Ky. Ct. App. 2007) .......................................... 17

*Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543 (6th Cir. 2006) ..............................*passim*

*LNV Corp. v. Harrison Family Bus., LLC*, 132 F. Supp. 3d 683 (D. Md. 2015) .......................................................................... 14

*McGirr v. Rehme*, 891 F.3d 603 (6th Cir. 2018) .................................................. 9, 10

*PBGC v. Evans Tempcon, Inc.*, 630 F. App'x 410 (6th Cir. 2015) .................................*passim*

*PNC Bank, Nat'l Ass'n v. Goyette Mech. Co.*, 15 F. Supp. 3d 754 (E.D. Mich. 2014) .......................................................................*passim*

*Rose v. Ackerson*, 374 S.W.3d 339 (Ky. Ct. App. 2012) ........................................ 17

*SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657 (6th Cir. 2001) .............................. 14

*SEC v. Faulkner*, No. 3:16-cv-01735 (N.D. Tex. Sept. 12, 2018) .......................................... 17

*Spradlin v. Beads & Steeds Inns, LLC*, 674 F. App'x 482 (6th Cir. 2017) .............................. 16

*Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787 (6th Cir. 2009) .................................................. 11

## INTRODUCTION

Van Laurence Barker sits in federal custody on child-exploitation charges. (Cmpl. ¶ 140.) He left behind an enterprise that, by its own admission, operated as a "temporary system" in which new investor funds were "effectively recycled internally" to paper over a failing business. (Cmpl. ¶ 26 & Ex. D (Kennedy Statement). On the February 5, 2026 PML town hall convened by Defendant Kennedy, an investor who's a CPA told Kennedy directly: "You guys have been out of money for months … raising new funds to pay off the old funds. It's called a Ponzi scheme." (Cmpl. ¶ 142.) Kennedy conceded "no runway to keep it going much longer." (*Id.*) The mechanic was documentary: Defendants captioned an internal November 17, 2025 settlement folder, in their own words, "Now Neelema's Property — recycled funds to pay me." (Cmpl. ¶ 103.) Behind the incarcerated principal are seventeen-plus affiliated entities across four U.S. states and two foreign countries, more than 125 Private Money Lenders, and losses exceeding $26 million. (Cmpl. ¶¶ 2, 32, 108.) No one is running this enterprise. No one is protecting its remaining assets. And no one can do so until this Court acts.

Plaintiffs move under Federal Rule of Civil Procedure 66, KRS § 425.600, and this Court's inherent equitable powers for appointment of Michele Vives of Douglas Wilson Companies as Equity Receiver over the Defendant entities, the affiliated entities identified in the Complaint (¶¶ 32, 108), and individual-defendant assets traceable to PML funds. Two Complementary frameworks govern. The Sixth Circuit's five-factor test in *PBGC v. Evans Tempcon, Inc.*, 630 F. App'x 410, 415 (6th Cir. 2015), is satisfied on every element. The eight-factor framework articulated in *PNC Bank, Nat'l Ass'n v. Goyette Mechanical Co.*, 15 F. Supp. 3d 754, 758 (E.D. Mich. 2014), and applied five weeks ago by the Eastern District of Kentucky in *Burke & Herbert Bank & Trust Co. v. Bare Arms LLC*, No. 0:26-cv-00032-DLB-EBA (E.D. Ky. Mar. 10, 2026) (R.

& R.), adopted, ECF No. 21 (Mar. 27, 2026), is satisfied with equal force. *Burke & Herbert* granted a private-party receivership on a straightforward commercial default with no fraud, no incarcerated principal, and no affiliate web. If those facts warrant receivership, these — admitted Ponzi-style conduct, a principal in federal custody, seventeen-plus affiliates, more than 125 defrauded lenders, $26 million-plus in losses, and a parallel E.D.N.Y. TRO entered two days ago — warrant one *a fortiori*.

The urgency is not theoretical. On April 15, 2026, Judge Joan M. Azrack of the Eastern District of New York entered temporary restraining orders against these same Defendants and twenty-plus affiliated entities in a parallel PML action. *SummitBridge Wealth Mgmt. LLC v. Lighthouse Estates LLC*, No. 2:26-cv-00141-JMA-ST (E.D.N.Y.), ECF No. 73. What the E.D.N.Y. TROs cannot provide — and this Court's receivership can — is a unified, Court-supervised administrator empowered to marshal assets across every jurisdiction in which the enterprise operates, freeze and recover offshore transfers, and distribute what remains equitably to every defrauded PML that benefits all victims equally and fairly. Ms. Vives, President of Douglas Wilson Companies, currently serves as Permanent Receiver over the $690 million 1inMM Capital Ponzi estate in *SEC v. Zachary Horwitz* (C.D. Cal.) — the Central District's largest Ponzi matter to date. Her full qualifications — education, experience, representative matters, proposed approach, and fee schedule — are set forth in Exhibit 1 to this Motion; supporting DWC materials are filed as Exhibits 2 through 5. She will be represented by Terence G. Banich of Katten Muchin Rosenman LLP as Receiver's counsel. Plaintiffs respectfully ask that the Court grant the Motion and enter the accompanying Proposed Order.

## BACKGROUND

### A. *The Lighthouse enterprise, the PML class, and the post-arrest management vacuum.*

Defendant Barker founded and controlled Lighthouse Estates LLC and Starpoint Holdings LLC as the operational core of a real-estate enterprise targeting Private Money Lenders ("PMLs"). (Cmpl. ¶¶ 1–6.) The enterprise marketed short-term, asset-backed loans secured by Kentucky and Indiana real property, promising double-digit returns and first-position liens. (Cmpl. ¶¶ 4–5.) It enrolled more than 125 PMLs who collectively invested over $26 million. (Cmpl. ¶ 2.) The Cmplaint identifies at least seventeen affiliated LLCs through which Defendants received and concealed PML funds, including AVS Estates, Redwoods Real Estate, Red Door Legacy, Ceekou, Taihe Estates, Rhino Capital, Wavewell Foundation, Horizon View, ZiraCo, JAL Solutions, Hummingbird Aero, Bluestar Capital, and Brian Barker Aeronautical (Cmpl. ¶¶ 32, 108), plus foreign affiliates Estella Management (Thailand) and Spain De Los Reyes (Philippines), both of which received transfers traceable to PML funds (Cmpl. ¶¶ 33, 115–117). On December 19, 2025, federal agents arrested Barker on child-exploitation charges; he remains detained. (Cmpl. ¶ 140; Ex. 6 (Order of Detention Pending Trial).) Social-media accounts were deactivated, investor-facing websites went dark, and communications to Defendants have gone unanswered or been met with non-responsive messages. (Cmpl. ¶ 10.) The SummitBridge plaintiffs independently confirm the same post-arrest abandonment. (SummitBridge ECF No. 8 ¶ 6.)

### B. *Defendants' own admissions that the enterprise operated as a Ponzi-style recycling scheme.*

Six independent source documents — Defendants' own correspondence, text messages, meeting recordings, and internal communications — four of which are filed herewith as Exhibits 7 through 10, admit the recycling mechanic in Defendants' own words.

First, the Kennedy Letter (January 2026; Ex. 7). On Lighthouse letterhead, Defendant Kennedy wrote: "[A] temporary system evolved where KPL and PML loans were effectively

recycled internally. Operating costs and debt service were all supported by retained capital being rolled forward into new transactions. That system only works when inflows remain uninterrupted. … Once inflows slowed and leadership disruption occurred, the model became unsustainable." (Cmpl. ¶ 26 & Ex. D; Ex. 7, at 1–2.) Kennedy's proposed remediation — "Loan write-downs from KPL to realistic current values (30–50%)" (id.) — is itself an admission, in Defendants' own writing, of a 50–70% deficit against PML principal.

Second, the Barker texts to Plaintiff Tkac (2024–2025). Before his arrest, Defendant Barker described the model to Plaintiff Tkac in writing: the plan was to "recycle over our portfolio into the HML in iterations, while buying finished product off of their books" (Cmpl. ¶ 132), and to "juice the equity of unfinished houses anywhere straight into cash … divorcing returns from the day-to-day outcome of the house" (Cmpl. ¶ 135). Barker described off-books payments to "start paying down the balance … ahead of closing in increments of $10-$20k, based on cashflow." (Cmpl. ¶ 136.) Contemporaneously, he represented to Tkac a "100% project payout record." (Cmpl. ¶ 137.)

Third, the October 3, 2025 "Angels Meeting" recording (Ex. 8). Barker explained the model on the record to the enterprise's inner circle: the plan was to "keep rotating projects [through] three successive lenders, the leveraging and every single time and then using cash flow … to just pay off the projects altogether." (Cmpl. ¶¶ 96–98, 112.) Barker conceded — to his own team — that "the system is not inherently sustainable because … the outflow mechanism[,] national level refi entities[,] they're not gonna gobble up all that product as fast as you need them to." (Id.) He acknowledged that the system "allow[s] us to start removing private lenders from the roster" — i.e., new PML inflows retire older PMLs. (Id.)

Fourth, the February 5, 2026 PML Town Hall. Kennedy convened a Zoom call with the PML group and admitted "a system [was] being created where funds were being rolled over to make sure old loans were being paid … A Swap System of sorts was developed." (Cmpl. ¶ 142.) Lisa, a PML who is herself a CPA, told Kennedy to his face: "You guys have been out of money for months … raising new funds to pay off the old funds. It's called a Ponzi scheme." (*Id.*) PML Raj told Kennedy: "[T]his operation evolved into some sort of a Ponzi[-]like situation where you're paying out prior loans." (*Id.*) Kennedy responded with concession, not denial: he acknowledged "no runway to keep it going much longer" and proposed write-downs and new liens against Starpoint/Lighthouse. (*Id.*)

Fifth, the Takedown Plays email (July 22, 2025; Ex. 9). In a July 22, 2025 email to KPL stakeholders, Barker detailed the scheme's mechanism in unambiguous terms: "We are refining the concept I shared with Eric last Friday wherein one half of Starpoint effectively eats a 'loss' so that the collective venture can profit. . . . The concept involves using two allotments of borrowed funds to cover down and vault into control of finished, saleable assets." (Ex. 9; Loftus Decl. ¶ 12.) This internal correspondence — drafted months before Barker's arrest, while the enterprise was presenting PML investments as asset-backed loans — establishes that the use of one pool of borrowed funds to "cover down" another was a deliberate design feature. The word "loss" appears in Barker's own quotation marks because he understood that allocating a loss to one Starpoint vehicle to enable a different vehicle to profit was artificial. Defendants were engineering accounting outcomes, not conducting real-estate transactions.

Sixth, the Sislow operating-model text (October 1, 2025; Ex. 10). Two days before the October 3 Angels Meeting, a Barker associate described the enterprise's core business model with equal candor: "[KPL] function[s] basically like a PML, and just send[s] us the $100k. Instead of

having any expectation of refurb, they WANT us to use the funds to operate ourselves. . . . Our focus is on getting the average growth rate per week AS LOW AS POSSIBLE, because that extends capital runway." (Ex. 10; Loftus Decl. ¶ 13.) The phrase "capital runway" is the operative admission: PML funds were not being deployed into real-estate rehabilitation — the stated purpose of every PML investment — but into operations, i.e., to sustain the enterprise's ability to continue taking in new investor capital. That is the textbook definition of a Ponzi scheme, stated in the scheme's own internal communications.

These admissions are corroborated at the single-transaction level. Plaintiff Simaya wired four PML advances totaling $365,000 for identified properties. (Cmpl. ¶¶ 14(a)–(d).) On November 17, 2025, Lighthouse representative Donaldson sent Simaya a "PML PAYOUT | 1941 W. 10th Place" email listing "Interest payment = -$14,000 (you were paid $14k directly from Lighthouse)" and drawing the payoff from a newly recruited PML, Neelema Sinha. (Cmpl. ¶ 103.) Defendants' own internal folder is captioned "Now Neelema's Property — recycled funds to pay me." (*Id.*) No sale. No refinance. A new PML's deposit paid an earlier PML — with the word "recycled" in Defendants' own files.

### C. *Documentary concealment; corporate architecture; and the post-exposure proposal to continue the scheme.*

The recycling mechanic was facilitated by a cadence of recorded-document conduct. People's Bank loan officer Douglas Weede executed at least six mortgage releases against enterprise collateral in two clusters: April 28, 2025 (Jefferson County Deed Book 13065, Pages 897–98, 913–14, 918–19) and December 26, 2025 (Deed Book 13237, Pages 500–01, 654–55, 685–86) — the latter cluster recorded one week after Barker's federal arrest, while the enterprise was operating without a principal capable of signing for it. (Cmpl. ¶¶ 27, 140.) Barker's pre-arrest

text to Tkac — "My confidence in Marcia is 100%" (Cmpl. ¶ 138) — reflects the institutional relationship that allowed serial release-and-re-encumbrance to continue post-arrest.

The corporate architecture admits the design. Lighthouse is owned 81% by Ariel Mermelshtayn / 10% by Barker / 9% by Kennedy; Starpoint is owned 81% by Barker / 19% by Kennedy; AVS Estates is owned 34%/33%/33% by Van Barker, Ariel Barker, and Defendant Zheng. (Cmpl. ¶¶ 108–110.) An internal folder is captioned, in Defendants' own words, "Red Door Legacy (Clone of Lighthouse Estates for Refi Batching)." (Cmpl. ¶ 111.) The CeeKou LLC signature block on a Simaya transaction was executed as "Lighthouse Estates LLC, a Kentucky Limited Liability company by Van Barker" — admitting on the face of the closing documents that CeeKou was merely a vehicle for Lighthouse. (Cmpl. ¶ 259.) And additional LLCs were formed *after* the fraud was exposed in January 2026 (Cmpl. ¶ 109), confirming that the corporate-formation machinery was a tool of concealment.

What Defendants proposed after exposure removes any remaining doubt. In January 2026 — days after Kennedy's written "temporary system" admission — Lighthouse representative Metten circulated a proposal requiring existing PMLs to accept principal write-downs and authorizing Defendants to recruit new PMLs on revised terms. (Cmpl. ¶ 24.) Metten quantified: "approximately $60 million in debt outstanding against assets worth '30 to 50 cents on every dollar,'" and "approximately 270 properties." (Id.) Curran Barker separately reassured a PML that the enterprise would reach "deeper pockets elsewhere" to satisfy obligations (Cmpl. ¶ 22) — a reference to individual defendants' personal assets, consistent with Donaldson's contemporaneous "I will pay you myself if this goes sideways" statement (id.). The Metten proposal is, by definition, the continuation of a Ponzi scheme: paying impaired obligations to old investors with new investor capital.

### D. *The parallel E.D.N.Y. SummitBridge TRO.*

On April 15, 2026 — about a week before the filing of this Motion — Judge Azrack granted TROs against these same Defendants and twenty-plus affiliated entities. *SummitBridge* ECF No. 73 (E.D.N.Y.). A federal court has now found the enterprise's fraud sufficiently serious, and the risk of asset dissipation sufficiently imminent, to justify emergency prejudgment restraints. The E.D.N.Y. ruling does not bind this Court, but it corroborates every material fact on which Plaintiffs rely here and underscores what is already beyond serious dispute: these assets are at risk, these Defendants cannot be trusted to preserve them, and only a Court-supervised fiduciary can unify recovery across overlapping forums, and that should all emanate from the Defendants home forum where the real estate and accounts are located.

### LEGAL STANDARD

Federal Rule of Civil Procedure 66 and this Court's inherent equitable powers authorize appointment of a receiver to safeguard disputed assets and assist the Court in achieving a final, equitable distribution. *See Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543 (6th Cir. 2006); *Digital Media Solutions, LLC v. S. Univ. of Ohio, LLC*, 59 F.4th 772, 780 (6th Cir. 2023) (Rule 66 directs courts to traditional practice). In diversity actions, "'an appointment of [a] receiver generally will be governed by federal, not state, law.'" *Grayiel v. AIO Holdings, LLC*, No. 3:15-CV-821-CHB, 2023 WL 5281933, at *22 (W.D. Ky. Aug. 16, 2023) (collecting cases). Kentucky's parallel statutory authority, KRS § 425.600, is consistent with the federal standard and provides an alternative ground. *See Burke & Herbert*, ECF No. 20 at 1–3 (invoking both Rule 66 and KRS § 425.600).

Two complementary frameworks govern. The Sixth Circuit's five-factor test weighs (i) imminent danger of loss or dissipation; (ii) fraudulent conduct; (iii) inadequacy of legal remedies; (iv) lack of less drastic equitable remedies; and (v) whether appointment will do more good than

harm. *PBGC v. Evans Tempcon, Inc.*, 630 F. App'x 410, 415(6th Cir. 2015). The eight-factor framework applied in *Burke & Herbert* adds express consideration of (1) adequacy of security, (2) financial position, (6) balance of harms, (7) probable success and irreparable injury, and (8) whether the interests sought to be protected will be well-served. *PNC Bank, Nat'l Ass'n v. Goyette Mech. Co.*, 15 F. Supp. 3d 754, 758 (E.D. Mich. 2014); *Burke & Herbert*, ECF No. 20 at 2–3. Receivership is "an extraordinary remedy" granted "in cases of clear necessity to protect plaintiff's interests in the property." *Evans Tempcon*, 630 F. App'x at 414. That necessity is shown here under both frameworks. Once it is shown, the Sixth Circuit has confirmed that district courts "enjoy[] broad equitable powers" over the receivership's scope and administration. *Liberte Capital*, 462 F.3d 543. And concealment or dissipation of assets likely obtained through fraud independently constitutes irreparable harm. *McGirr v. Rehme*, 891 F.3d 603 (6th Cir. 2018).

## **ARGUMENT**

### I. THE *EVANS TEMPCON* AND *PNC BANK FACTORS* BOTH COMPEL APPOINTMENT.

The Sixth Circuit's five-factor test and the *PNC Bank* eight-factor framework applied five weeks ago in *Burke & Herbert* substantially overlap. *See PBGC v. Evans Tempcon*, 630 F. App'x at 414–16; *Burke & Herbert*, ECF No. 20 at 2–3 (applying *PNC Bank*, 15 F. Supp. 3d at 758). Each element of each framework points to appointment; only one *PNC Bank* factor — advance contractual consent — is absent, and its absence is not disqualifying.

### A. *The enterprise's remaining assets are in imminent danger of dissipation.*

The first *Evans Tempcon* factor and the parallel PNC Bank "imminent danger of loss" factor ask whether the property is at risk of being "lost, concealed, injured, diminished in value, or squandered." 630 F. App'x at 414. It is. The enterprise's sole operational principal is incarcerated (Ex. 6); its websites are dark; its bank balances are unknown to any PML; and its corporate

affiliates span four U.S. states and two foreign countries. (Cmpl. ¶¶ 9–16, 140.) Transfers to Thailand and the Philippines have already occurred. (Cmpl. ¶¶ 33, 115–117.) The cadence of documentary concealment continued even after Barker's arrest: three mortgage releases recorded at Jefferson County Deed Book 13237 on December 26, 2025 — one week after Barker was taken into custody. (Cmpl. ¶¶ 27, 140.) A sister federal court found that same risk sufficient to justify a TRO against these same Defendants — two days before this Motion was filed. (SummitBridge ECF No. 73.) The post-arrest mortgage releases are the sharpest evidence of all: Defendants continued to execute and record releases against enterprise collateral even after their principal was in federal custody — demonstrating that the dissipation risk is not theoretical but already in progress.

The Sixth Circuit has held that "the concealment and dissipation of assets likely obtained through fraud constitutes irreparable harm." *McGirr v. Rehme*, 891 F.3d 603 (6th Cir. 2018). A W.D. Ky. court has just entered the same relief Plaintiffs seek — injunctive restraint of transfers to affiliates and disgorgement to a court-appointed receiver. *Embry v. Discount Motors, LLC*, No. 4:23-cv-00078 (W.D. Ky. Jan. 22, 2026). Absent a receiver with affirmative custodial authority, these assets will not survive the pleading stage. *See Liberte Capital*, 462 F.3d 543, 551 (receivership appropriate to safeguard disputed assets of commingled enterprise).

### B. Defendants have admitted fraudulent conduct in their own words.

The *Evans Tempcon* fraud factor and the PNC Bank fraud factor are satisfied by Defendants' own admissions, catalogued in Background § B (Exs. 7–10). In short: Kennedy wrote on Lighthouse letterhead that the enterprise was a "temporary system" in which PML "loans were effectively recycled internally" and became "unsustainable" when inflows slowed (Cmpl. ¶ 26 & Ex. D; Ex. 7); Barker told Plaintiff Tkac in writing that the model was to "recycle over our portfolio" and to "juice the equity of unfinished houses … divorcing returns from the day-to-day

outcome of the house" (Cmpl. ¶¶ 132, 135); on the October 3, 2025, Angels Meeting (Ex. 8), Barker conceded to his own inner circle that "the system is not inherently sustainable" and required "rotating projects [through] three successive lenders" (Cmpl. ¶¶ 96–98, 112); and on the February 5, 2026 PML call Kennedy admitted a "Swap System" was "developed" while the PMLs told him, "You guys have been out of money for months … It's called a Ponzi scheme" (Cmpl. ¶ 142). Those admissions are corroborated at the transaction level: the November 17, 2025 "PML PAYOUT" email and the internal folder "Now Neelema's Property — recycled funds to pay me" memorialize one investor's fresh capital paying an earlier investor's return — the defining mechanic of a Ponzi scheme. (Cmpl. ¶ 103.)

This record distinguishes *Burke & Herbert* sharply. That case involved a straightforward commercial default with no fraud, and the court found the fraud factor neutral. ECF No. 20 at 4. Here, the fraud factor weighs overwhelmingly in favor of appointment. The Sixth Circuit's equitable discretion in fraud actions reaches commingled proceeds and third-party transferees. *Holt v. Griffin*, 865 F.3d 417 (6th Cir. 2017); *see also Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 799 (6th Cir. 2009) Nor is the fraud historical: in January 2026, Lighthouse representative Metten circulated a proposal requiring existing PMLs to accept principal write-downs *and* authorizing Defendants to recruit *new* PMLs on revised terms — against "$60 million in debt outstanding" at "30 to 50 cents on every dollar." (Cmpl. ¶ 24.) Defendants have proposed, in writing, the continuation of the Ponzi scheme itself. A prohibitory injunction alone is not a remedy responsive to that admitted intent.

### C. Legal remedies are inadequate, no less drastic equitable remedy will work, and the balance of harms favors appointment.

Three factors collapse into a single analysis. A money judgment against Barker is worth nothing when entered after the remaining assets are gone. A money judgment against Lighthouse

is meaningless if its assets have been routed through Ceekou, AVS, Starpoint, and seventeen-plus other affiliates. (Cmpl. ¶¶ 32, 108.) A money judgment against an offshore affiliate is uncollectible without ancillary proceedings that a federal receiver — unlike a private plaintiff — is specifically empowered to pursue. And no Defendant entity has a functioning officer capable of responding to discovery, preserving documents, or complying with subpoenas. (Cmpl. ¶ 10.) Legal process itself is not functioning.

A standalone asset freeze will not fill the gap. An injunction *prohibits* transfers; it appoints no one to marshal assets, pay preservation expenses, or initiate foreign proceedings. The E.D.N.Y. TROs illustrate the limit: Judge Azrack restrained Defendants' transfers, but in a two-plaintiff action against a multistate, multinational enterprise she could not provide day-to-day administration of the estate. (*SummitBridge* ECF No. 73.) Federal courts routinely appoint receivers *in addition to* injunctive relief in Complex fraud matters, not as a substitute for it. *See Liberte Capital*, 462 F.3d 543, 551. Monitorship, voluntary dissolution, and bankruptcy are likewise inadequate: a monitor has no custodial authority; voluntary dissolution requires cooperating management that does not exist; bankruptcy would displace this Court's jurisdiction and delay rather than accelerate distribution.

The balance of harms is one-sided. The benefits are concrete: preservation of assets at immediate risk, centralized administration across overlapping forums, forensic asset tracing by qualified professionals, and equitable distribution to more than 125 PMLs whose interests are currently represented by no one. The costs — receiver fees, paid from the estate subject to Court approval — are modest. No legitimate Defendant interest is prejudiced. An incarcerated principal cannot manage an enterprise; corporate defendants with no functioning officers cannot be "deprived" of control they do not possess; and Kennedy and Zheng retain every procedural right

to defend the litigation and to be heard on the scope of the receivership. What they cannot do is continue to control assets that belong, in equity, to the PMLs they defrauded. Weighed together — as *Evans Tempcon* requires, 630 F. App'x at 415— every factor points the same direction: appointment is necessary, and Defendants bear no legitimate harm from it.

### D. Each of the Four Remaining PNC Bank Factors — Security, Financial Position, Probable Success, and Investor Interests — Independently Confirms Appointment Is Warranted.

The *PNC Bank* framework adds four considerations the *Evans Tempcon* test does not expressly address. Each favors appointment. Adequacy of security and financial position — treated in *Burke & Herbert* as "the most important" factors, ECF No. 20 at 3 — are stronger here than in that case. Defendants have no identified security for the $26 million-plus in PML obligations beyond real property interests that have been re-pledged, misrepresented, or routed to affiliates; the enterprise has devolved, by its own admission, into a "recycl[ing]" system (Cmpl. ¶ 26); and Metten's January 2026 proposal conceded "$60 million in debt outstanding" against assets valued at "30 to 50 cents on every dollar" (Cmpl. ¶ 24). If the commercial default record in *Burke & Herbert* cleared this threshold, the admitted insolvency and commingled-proceeds structure here clears it decisively.

Probable success and irreparable injury are established by Defendants' own admissions, by the undisputed fact of Barker's federal incarceration, and by the E.D.N.Y. court's independent finding that the same allegations warranted emergency TROs. (*SummitBridge* ECF No. 73.) *Cf. Burke & Herbert*, ECF No. 20 at 4–5 (finding likelihood of success where borrower had defaulted and property taxes were unpaid).

Finally, the interests to be protected will be well-served by a receivership. It is the only vehicle capable of delivering the *equitable* distribution that Ponzi-scheme recovery requires. The Sixth Circuit has endorsed the principle that, in receiverships administering commingled fraud

13

proceeds, "equality is equity" — each defrauded investor recovers pro rata from the pooled estate rather than through a first-come-first-served race to judgment. *SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 671 (6th Cir. 2001). Outside of a unified receivership, the more than 125 PMLs identified in the Complaint (and the uncounted PMLs who have not yet surfaced) would recover unevenly or not at all.

### E. The absence of advance contractual consent is not disqualifying.

The only *PNC Bank* factor not squarely satisfied is advance contractual consent to a receiver. *Burke & Herbert* had consent; Plaintiffs' PML loan documents do not. ECF No. 20 at 4. That difference is immaterial for three reasons. First, consent is one factor among eight, not a prerequisite. *LNV Corp. v. Harrison Family Bus., LLC*, 132 F. Supp. 3d 683, 695 (D. Md. 2015) (consent "is one factor, among many"; "parties … cannot through their contract obligate the court to appoint a receiver"); *see also Liberte Capital*, 462 F.3d 543, 551 (affirming Ponzi receivership absent consent provision). Second, *Burke & Herbert* treated consent as "weigh[ing] in favor" of appointment, *id.* at 4, while separately finding the *other* seven factors "substantially weigh" in favor of the remedy. Every one of those seven factors is stronger here. Third, consent's functional purpose — ensuring the defendant understood at inception that receivership was a foreseeable consequence — is satisfied here by a different mechanism: Defendants' own post-default admissions describing the enterprise as a recycling scheme and the principal's incarceration. Consent or no consent, this record establishes "clear necessity" with a clarity no contract clause could provide. *Liberte Capital*, 462 F.3d 543, 584.

### F. Grayiel is distinguishable on every dispositive fact.

Defendants will predictably invoke *Grayiel v. AIO Holdings, LLC*, No. 3:15-CV-821-CHB, 2023 WL 5281933 (W.D. Ky. Aug. 16, 2023), as same-district authority for denial. It is not. The *Grayiel* record differs from this one in four dispositive ways: that dispute concerned contested

ownership of natural-gas assets, not a Ponzi scheme; the record showed partial cooperation and ongoing management, not incarcerated absence; the proposed receiver was insufficiently neutral, not a disinterested national fiduciary; and the matter was bilateral and bounded, not a 125-plus-PML, seventeen-plus-affiliate, two-country enterprise. *Grayiel* confirms the factors must be carefully applied. Careful application here yields the opposite result.

## II. THE RECEIVERSHIP SHOULD EXTEND TO AFFILIATED ENTITIES AND TO TRACEABLE PERSONAL ASSETS.

A receivership's scope must match the scope of the fraud. *See Digital Media Solutions*, 59 F.4th at 781 (scope bounded by jurisdiction over "assets disputed in litigation before the court"). Plaintiffs request three concentric rings of property: (A) each Defendant entity; (B) the affiliated entities operating as instruments of the fraud; and (C) individual-defendant assets traceable to investor funds — including foreign affiliates via authorized ancillary proceedings.

### A. Seventeen-plus affiliated entities should be included as instruments of the enterprise under Kentucky alter-ego law.

Because this action sounds in diversity and the alter-ego question goes to substantive rights in property, Kentucky veil-piercing law supplies the rule of decision. The Sixth Circuit applies Kentucky's two-element framework: "(1) domination of the corporation resulting in a loss of corporate separateness and (2) circumstances under which continued recognition of the corporation would sanction fraud or promote injustice." *CNH Capital Am. LLC v. Hunter Tractor & Equip., Inc.*, 568 F. App'x 461, 467–68 (6th Cir. 2014); *accord Spradlin v. Beads & Steeds Inns, LLC*, 674 F. App'x 482, 485–86 (6th Cir. 2017); *Hodak v. Madison Capital Mgmt., LLC*, 348 F. App'x 83, 91 (6th Cir. 2009).

Both elements are pleaded with specificity. *Domination*: Barker was the controlling principal across the entire web; Lighthouse and Starpoint operated as front-facing entities; and seventeen-plus affiliates — among them Ceekou, AVS Estates, Redwoods Real Estate, Red Door

Legacy, Taihe Estates, Rhino Capital, Wavewell Foundation, Bluestar Capital, and Brian Barker Aeronautical — operated with no independent business purpose, commingled funds, and shared personnel. (Cmpl. ¶¶ 32, 108.) The closing documents themselves admit the alter-ego structure: the CeeKou LLC signature block on a Simaya transaction was executed as "Lighthouse Estates LLC, a Kentucky Limited Liability company by Van Barker," conflating two putatively separate entities under one controlling principal. (Cmpl. ¶ 259.) *Fraud or injustice*: the affiliate structure is not incidental to the fraud — it is the mechanism. PML funds were deposited into Lighthouse- or Starpoint-facing accounts, rerouted through affiliate entities, partially applied to personal property, and then "repaid" with new PML deposits. (Cmpl. ¶¶ 103, 259, 286–290.) When the scheme was exposed in January 2026, Defendants *formed additional LLCs* rather than wind down existing ones (Cmpl. ¶ 109) — confirming that the corporate-formation machinery was a tool of concealment. Recognizing these affiliates as separate would, in *CNH Capital's* words, "sanction fraud." 568 F. App'x at 467–68. The independent *SummitBridge* Cmplaint — drafted by different counsel on a different record — identifies the same affiliates. (*SummitBridge* First Am. Verified Cmpl. at 1–2.) Two separate groups of PMLs, on independent investigations, reached the same conclusion.

### B. *Individual-defendant assets traceable to PML funds should be included via constructive trust; foreign affiliates via authorized ancillary proceedings.*

Under Kentucky law, a constructive trust is imposed where a person obtains property by fraud or unconscionable conduct and it would be inequitable to permit retention. The Kentucky Supreme Court has endorsed the doctrine as an equitable remedy against unjust enrichment. *Davis v. Davis*, 489 S.W.3d 225 (Ky. 2016); *see also Keeney v. Keeney*, 223 S.W.3d 843, 849 (Ky. Ct. App. 2007); *Rose v. Ackerson*, 374 S.W.3d 339, 343 (Ky. Ct. App. 2012). Personal-asset receivership in commingled-fraud cases is an accepted federal remedy. *SEC v. Faulkner,* No. 3:16-cv-01735 (N.D. Tex. Sept. 12, 2018). ("[r]eceivers may also be appointed over individual—not

only corporate—defendants if their fraudulent conduct makes such an appointment appropriate."). Plaintiffs do not seek at this stage to seize unrelated personal property; they seek only traceable proceeds — real estate, vehicles, and other assets purchased with PML funds. (Cmpl. ¶¶ 286–290.) The Proposed Order confines the receivership to traceable property and reserves to the Receiver the obligation to demonstrate traceability before any non-traceable asset is brought into the estate.

The Proposed Order also authorizes — but does not require — the Receiver to initiate ancillary proceedings in Thailand (Estella Management) and the Philippines (Spain De Los Reyes), and to pursue traceable recovery in those jurisdictions. (Cmpl. ¶¶ 33, 115–117.) A U.S. receivership order does not automatically bind foreign courts. But it is materially more effective in those proceedings than no order at all, and it is the single mechanism by which PML recovery across these jurisdictions can proceed on a unified basis.

### III. THE PARALLEL E.D.N.Y. LITIGATION CORROBORATES — AND DOES NOT DISPLACE — THE NEED FOR THIS RECEIVERSHIP.

On April 15, 2026, Judge Azrack granted TROs in *SummitBridge Wealth Mgmt. LLC v. Lighthouse Estates LLC*, No. 2:26-cv-00141-JMA-ST (E.D.N.Y.), ECF No. 73. That ruling independently corroborates the factual predicate for this Motion: the *SummitBridge* plaintiffs are represented by different counsel, pleading different causes of action, on a different factual record, and their allegations independently confirm Barker's post-arrest absence, the recycling of PML funds, and the affiliate architecture. (*SummitBridge* ECF No. 8 ¶¶ 2–6.) But *SummitBridge* also illustrates the limit of a TRO-only remedy: Judge Azrack restrained transfers; she did not appoint an administrator, did not set a distribution protocol, and could not empower anyone to liquidate commingled proceeds or prosecute recovery in Thailand. A receivership in this Court supplements — rather than duplicates — the E.D.N.Y. proceedings. Upon appointment, the Receiver will coordinate with the *SummitBridge* plaintiffs and any other PML claimants to ensure a single,

17

unified administration of the estate; that coordination is standard practice in multi-forum Ponzi receiverships and is a capability Ms. Vives has demonstrated before.

## IV.  THE PROPOSED RECEIVER IS QUALIFIED, INDEPENDENT, AND PREPARED TO SERVE.

The evidentiary predicate for this Motion — including the Barker detention order (Ex. 6), the Kennedy Letter (Ex. 7), the October 3, 2025 Town Hall recording (Ex. 8), the Takedown Plays email (Ex. 9), the Sislow operating-model texts (Ex. 10), and the mortgage release records — is authenticated in the Declaration of Alexander N. Loftus, filed as Exhibit 3 hereto. (Loftus Decl. ¶¶ 5–15, Ex. 3.)

Terence G. Banich of Katten Muchin Rosenman LLP will serve as Receiver's counsel. Mr. Banich's qualifications and willingness to serve are set forth in his Declaration, filed as Exhibit 2 hereto. (Banich Decl., Ex. 2.)

Ms. Vives has confirmed her independence: neither she, nor Douglas Wilson Companies ("DWC"), nor any proposed team member has any prior relationship with any party in this action. (Vives Decl. ¶¶ 13–14, Ex. 1.) She has reviewed the Complaint and Motion, understands the scope of the proposed receivership, and is prepared to begin immediately upon appointment. (Vives Decl. ¶¶ 15–17, Ex. 1.)

DWC's in-house accounting team — led by Lynn Goodridge, CPA, and Rene Weidman, Controller and CPA — brings nineteen years of accounting experience, thirteen years of CPA licensure, and extensive expert-witness testimony experience to the forensic reconstruction demands of this matter. (Vives Decl. ¶ 6, Ex. 1; Exs. 1–2 (DWC engagement letter and rate schedule).) That capability is not merely beneficial; it is essential. The Complaint and supporting evidence establish that defendants systematically commingled PML investor funds across multiple

entities and jurisdictions. Forensic accounting by qualified in-house professionals, supervised by the Court and subject to fee applications, is the appropriate and cost-effective vehicle for that work.

Ms. Vives has also administered multi-entity portfolio receiverships requiring cohesive management of assets held across eighteen or more entities under a single common owner (LCC Warehouse 1 LLC, Orange County Superior Court, California) and has managed a 246-unit apartment Complex through a contested partnership dispute and ultimate sale (Villa Del Sol, San Diego). (Vives Decl. ¶¶ 10–12, Ex. 1; Ex. 5 (DWC Real Estate Receiverships Brochure).) Both engagements directly parallel this matter's multi-entity corporate structure and the need for centralized, Court-supervised management of real property assets.

Of particular relevance is Ms. Vives's current appointment in *SEC v. Zachary Horwitz*, No. 2:21-cv-02927 (C.D. Cal.). In that matter, Horwitz solicited approximately $690 million from investors through a fraudulent film-investment scheme — the Central District's largest Ponzi matter to date. Ms. Vives was appointed Permanent Receiver with full equity powers over multiple corporate entities, charged with marshaling assets, tracing investor funds, and overseeing a court-supervised claims-dispute process. (Vives Decl. ¶ 9, Ex. 1; Ex. 4 (DWC Federal Receiverships Brochure).) The structural features of the Horwitz fraud — a single promoter operating through multiple corporate entities, systematic commingling of investor proceeds, and diversion of capital for the promoter's personal enrichment — are materially analogous to the scheme alleged in this Complaint. Plaintiffs' counsel represented over 100 investors in the *Horwitz* case and worked with the Vives and Banich on recoveries from various aiders and abettors yielding significant recoveries efficiently. Large Ponzi schemes rarely originate in Kentucky. Because such schemes are uncommon here, this class benefits from counsel with national experience in complex fraud remediation. While specialized expertise commands a premium, the efficiencies of a nationwide

practice—in methodology, resources, and established relationships—reduce overall costs and accelerate recovery.

Michele Vives, President of Douglas Wilson Companies, brings to this matter precisely the qualifications this receivership demands: a decade of senior leadership at the largest receivership entity in the United States, personal oversight of more than $1 billion in combined project assets, active appointment as Permanent Receiver in the largest Ponzi matter in the Central District of California's history, and an in-house team of forensic accounting professionals with expert-witness experience. (Vives Decl. ¶¶ 3–6, Ex. 1.) Her full qualifications — education, professional background, select matter experience, conflicts analysis, proposed approach, and fee schedule — are set forth in detail in her Declaration, filed as Exhibits 1 through 5 hereto.

Courts appointing equity receivers must consider the qualifications and fitness of the proposed receiver. See *PBGC v. Evans Tempcon*, 630 F. App'x at 415 (proposed receiver's qualifications are relevant to the appointment inquiry). The proposed receiver must be disinterested, competent, and capable of administering the estate. The record here satisfies that standard by a wide margin.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court enter the accompanying Proposed Order and specifically:

(a) Appoint Michele Vives of Douglas Wilson Companies as Equity Receiver over (i) each Defendant entity; (ii) the affiliated entities identified in the Complaint, including Ceekou LLC, AVS Estates LLC, Red Door Legacy LLC, Taihe Estates LLC, Redwoods Real Estate LLC, Bluestar Capital LLC, Estella Management (Thailand), and Spain De Los Reyes (Philippines); (iii)

20

the individual Defendants' assets to the extent traceable to PML funds; and (iv) all successor entities, nominees, and custodians of enterprise property;

(b) Authorize Terence G. Banich of Katten Muchin Rosenman LLP to serve as Receiver's counsel;

(c) Impose an immediate asset freeze restraining Defendants and their affiliated entities, officers, agents, and persons acting in concert with them from transferring, encumbering, or dissipating property of the receivership estate;

(d) Enter an anti-litigation injunction staying third-party actions against the receivership estate pending further order of the Court;

(e) Direct the Receiver to file an initial status report within 30 days of appointment, an asset inventory within 60 days, and a proposed distribution plan within 180 days;

(f) Authorize the Receiver to initiate ancillary proceedings in any U.S. or foreign jurisdiction necessary to identify, preserve, or recover estate property;

(g) Reserve to the Court authority to modify the receivership's scope on application by the Receiver, any Defendant, or any PML claimant; and

(h) Grant such other and further relief as the Court deems just and proper, including costs and attorneys' fees under any applicable statute or equitable authority.

## CONCLUSION

Receivership is an extraordinary remedy. This is an extraordinary case. Defendants have, in their own writing and on their own recordings, admitted that the enterprise operated as a "temporary system" of "recycl[ed]" PML funds — what their own CPA investor called, on a call Defendants themselves convened, a "Ponzi scheme." (Cmpl. ¶¶ 26, 132, 135, 142 & Ex. D; Exs. 7–10.) The principal is in federal custody, the seventeen-plus affiliated entities span four U.S.

states and two foreign jurisdictions, more than 125 PMLs have lost in excess of $26 million, and a federal court has already restrained these Defendants' assets in a parallel action on corroborating facts. Every *Evans Tempcon* factor and every material PNC Bank factor favors appointment on a record materially stronger than the one that commanded the same remedy in *Burke & Herbert* five weeks ago. Plaintiffs respectfully request that the Court grant the Motion, appoint Michele Vives as Equity Receiver, and enter the Proposed Order.

Dated: April 21, 2026                    Respectfully submitted,

                                         LOFTUS & EISENBERG, LTD.

                                         By:    *Alexander Loftus*

                                         Alexander N. Loftus
                                         *(pro hac vice pending)*
                                         181 W. Madison Street, Suite 4700
                                         Chicago, Illinois 60602
                                         Telephone: (312) 899-6625
                                         alex@loftusandeisenberg.com

                                         Local Counsel:

                                         MICHELE HENRY LAW, P.C.

                                         By: /s/ *Michele D. Henry*
                                         Michele D. Henry
                                         517 W. Ormsby Avenue
                                         Louisville, Kentucky 40203
                                         Telephone: (502) 536-0085
                                         mhenry@michelehenrylaw.com
                                         *Counsel for Plaintiffs and Proposed Class*

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record. For any Defendant not yet represented by counsel at the time of filing, a true and correct copy will be served concurrently with the Summons and Complaint by the process server in accordance with Federal Rule of Civil Procedure 4.


/s/ *Alexander N. Loftus*