**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| CRYSTAL CERVANTEZ-TKAC, et al., individually and on behalf of all others similarly situated, | ) ) ) ) |
| | ) Case No. 3:26-cv-00280-CHB |
| Plaintiffs, | ) |
| | ) |
| v. | ) Chief Judge Claria Horn Boom |
| | ) |
| VAN LAURENCE BARKER; JOSHUA JAMES KENNEDY; SIYUAN ZHENG; LIGHTHOUSE ESTATES LLC; and STARPOINT HOLDINGS LLC, | ) ) ) ) |
| | ) |
| Defendants. | ) |

**DECLARATION OF ALEXANDER N. LOFTUS**
**IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR APPOINTMENT OF AN EQUITY RECEIVER**

**1.** I am a partner at Loftus & Eisenberg, Ltd., co-counsel of record for plaintiffs Crystal Cervantez-Tkac and Simaya Innovations LLC in this action. I make this declaration based on my personal knowledge and on a review of the documents and evidence obtained during the investigation of this matter. I am admitted to the bars of the State of Illinois and have filed a motion for admission pro hac vice in this district.

**2.** I submit this declaration in support of plaintiffs' Motion for Appointment of an Equity Receiver. Exhibits 6 through 10 to the Motion are authenticated herein. Each exhibit is maintained in the files of Loftus & Eisenberg, Ltd. in connection with this litigation, and each is described and identified below.

## OVERVIEW OF THE FRAUD

**3.** This action arises from a large-scale Ponzi scheme operated by defendant Van Laurence Barker through the corporate entities Lighthouse Estates LLC and Starpoint Holdings LLC, with the assistance of co-defendants Joshua James Kennedy and Siyuan Zheng. From at least 2022 through December 2025, defendants solicited more than $26 million from more than 125 private money lenders ("PMLs") through fraudulent representations that investor funds would be used to make short-term real estate bridge loans secured by real property in first-lien position. Instead, defendants diverted investor funds for personal enrichment and to fund Ponzi-style payments to earlier investors. (Compl. ¶¶ 26, 32, 108, 115–117.)

**4.** The scheme collapsed in December 2025 when Barker was arrested on federal criminal charges. Since his arrest, Lighthouse Estates LLC and Starpoint Holdings LLC have operated without active principals, real estate assets purportedly securing investor funds remain untended and exposed to deterioration, and there is no independent third party with authority to marshal, preserve, or protect estate assets for the benefit of 125 or more investor-victims. The evidence summarized below and attached to this declaration demonstrates the scope and mechanics of the fraud, Barker's own candid admissions concerning it, and the urgency of court-supervised protection.

## EXHIBIT 6: ORDER OF PRETRIAL DETENTION — VAN LAURENCE BARKER

**5.** Attached hereto as Exhibit 6 to the Motion is a true and correct copy of the Order of Pretrial Detention entered on December 22, 2025 by the Honorable Regina S. Edwards, United States Magistrate Judge, in the matter captioned *United States v. Van Laurence Barker*, Case No. 3:25-mj-00766-RSE, in the United States District Court for the Western District of Kentucky.

**6.** The Order of Pretrial Detention establishes that Barker was charged with a federal crime and ordered detained without bond. His detention confirms that as of at least December 19, 2025, the primary operator of the Lighthouse Estates and Starpoint Holdings scheme was incarcerated, leaving the corporate entities without management, their assets unsupervised, and the interests of 125 or more investor-victims unprotected.

**7.** The Order is a public document filed in a federal judicial proceeding in this district. I obtained it from the public dockets of this Court.

### <u>EXHIBIT 7: KENNEDY LETTER TO LIGHTHOUSE STAKEHOLDERS</u>

**8.** Attached hereto as Exhibit 7 to the Motion is a true and correct copy of a letter authored and signed by defendant Joshua James Kennedy and addressed to Lighthouse Estates LLC stakeholders. The Kennedy Letter was produced from the files of this litigation and was also filed as Exhibit D to the complaint in this action.

**9.** The Kennedy Letter constitutes a party-opponent admission by co-defendant Kennedy establishing the core mechanics of the Ponzi scheme. Kennedy acknowledges, in his own words:

> *"[A] temporary system evolved where KPL and PML loans were effectively recycled internally. Operating costs and debt service were all supported by retained capital being rolled forward into new transactions. That system only works when inflows remain uninterrupted. Once inflows slowed and leadership disruption occurred, the model became unsustainable."*

**10.** The Kennedy Letter further acknowledges that the portfolio requires loan write-downs from KPL to "realistic current values (30–50%)," confirming that the real-estate assets purportedly securing investor loans are worth substantially less than defendants represented to investors during the solicitation period. This admission underscores the urgency of immediate court supervision to prevent further dissipation of the remaining estate value.

**EXHIBIT 8: BARKER "TOWN HALL" MEETING TRANSCRIPT (OCT. 3, 2025)**

**11.** Attached hereto as Exhibit 8 to the Motion is a true and correct copy of the meeting minutes and transcript from a private investor meeting convened by defendant Barker and Marcia Donaldson on October 3, 2025 (the "Town Hall"). The transcript was prepared from an audio recording of that meeting and was produced in connection with this litigation. The meeting was attended by PML investors solicited by defendants.

**12.** At the Town Hall, Barker explained to the assembled investors—in real time—that Lighthouse had fundamentally restructured its business model to eliminate actual real estate rehabilitation and operate instead as a pure cash-cycling machine:

> *"[W]e don't do really any refurb. We do a maintenance work and move-in work. And we're growing that rental portfolio. But really what we're doing now is we're taking liquidity from the institutional lender by buying vacant properties and we tap that equity, convert it into cash and we fund cash to close. And we fund cash to close on deals that close deals for PMLs."*

**13.** Barker specifically acknowledged that the institutional lender (Kentucky Private Lending) had "lifted all restrictions on use of funds from the refurb," and instructed investors: "don't publicize too widely. This is kind of a close hold call." This instruction is consciousness-of-guilt evidence: Barker knew the model was not what had been represented to investors and sought to prevent its disclosure.

**14.** At the same meeting, Barker described the process of "hoovering up vacant properties, blighted properties across Kentucky, Indiana, and Ohio," and "juicing the equity in the form of refurb funds and then using that to fund deals." He acknowledged that this mechanism "creat[ed] a really nice consistent growth trajectory" precisely because it did not depend on "ground-level causes," external appraisals, or proof-of-reserves requirements—i.e., because it was insulated from any market check on actual asset values.

**EXHIBIT 9: BARKER EMAIL TO KPL RE "TAKEDOWN PLAYS" (JULY 22, 2025)**

15. Attached hereto as Exhibit 9 to the Motion is a true and correct copy of an email communication transmitted by defendant Barker, using the Starpoint Holdings email account (management@gostarpoint.com), to Aaron Metten and Eric Payne at Kentucky Private Lending, dated July 22, 2025, with the subject line "7/22-7/23 Discussion Topic: 'Takedown Plays.'" This document was produced in connection with this litigation by a Lighthouse investor who received it from Barker.

16. The Takedown Plays email is one of the most significant documentary admissions in this record. In it, Barker describes a structured scheme to use borrowed funds to acquire, free-clear, and quickly liquidate real estate assets at a loss—profiting not from the real estate, but from the float of recycled capital:

> *"We are refining the concept I shared with Eric last Friday wherein one half of Starpoint effectively eats a 'loss' so that the collective venture can profit. . . . The concept involves using two allotments of borrowed funds to cover down and vault into control of finished, saleable assets, at which point the goal is to sale them as quickly as possible to obtain new, external dollars."*

17. Barker's email walks through a worked numerical example using a $300,000 property: Starpoint borrows $210,000 from KPL at 70% LTV and $90,000 from Bear Capital for the cash-to-close requirement; pays off the KPL loan using "its own on-hand liquidity (itself all borrowed refurb dollars)"; firesales the property at $250,000; reimburses Bear Capital; and splits the remaining proceeds. The email projects "$500–$600,000 in lending profits" from cycling $1,427,000 in KPL funds through this structure. This is not a real estate business model. It is a description of a Ponzi mechanism, in Barker's own words, written to the institutional lender that financed it.

**EXHIBIT 10: BARKER TEXT MESSAGE TO INVESTOR RE OPERATING MODEL**
**(OCT. 1, 2025)**

**18.** Attached hereto as Exhibit 10 to the Motion is a true and correct copy of a text message and email forwarded by an investor to Loftus & Eisenberg, Ltd. in connection with this litigation. The document contains: (a) a text message transmitted by defendant Barker to an investor on or about October 1, 2025, in which Barker explains the operating mechanics of the Lighthouse/KPL capital recycling model; and (b) an email from Barker to KPL (Exhibit 9) that Barker separately forwarded to the same investor.

**19.** In the October 1 text message, Barker describes the model in plain terms:

*"[KPL] function[s] basically like a PML, and just send[s] us the $100k. Instead of having any expectation of refurb, they WANT us to use the funds to operate ourselves. . . . Typically speaking, we are finding we can originate about $800k on average weekly with KPL, and remove $500–$800k off their books. . . . Our focus is on getting the average growth rate per week AS LOW AS POSSIBLE, because that extends capital runway."*

**20.** The phrase "extends capital runway" is the operative admission: Barker is not describing a business that is generating returns for investors. He is describing a business designed to slow the consumption of borrowed capital—i.e., to delay the inevitable collapse of a scheme that pays old investors with new investors' money. The parallel to the Kennedy Letter's admission that "[t]hat system only works when inflows remain uninterrupted" is direct and devastating.

**ONGOING HARM AND URGENCY**

**21.** Based on my investigation and the documents described above, I believe the receivership estate faces imminent risk of further dissipation for the following specific reasons:

(a)  Barker is detained without bond and exercises no active management role in Lighthouse Estates LLC or Starpoint Holdings LLC. Both entities are operating without their primary principal, creating the risk of asset mismanagement, unauthorized transfers, and neglect of real property collateral.

(b)  Kennedy and Zheng, as remaining individual defendants, have demonstrated through the Kennedy Letter and the Town Hall communications that their interests are adverse to those of PML investors. Kennedy's proposed "stabilization" plan, as described in the Kennedy Letter, would effectively allow defendants to manage the very estate they defrauded, without court oversight.

(c)  The defendant admissions attached as Exhibits 7 through 10 establish that there are no legitimate investment returns supporting this portfolio. The assets purportedly securing investor loans were encumbered with prior-position liens, subject to write-downs of 30–50%, and were never the source of investor returns. Absent receivership, there is no protection against further encumbrances, transfers, or deterioration.

(d)  Absent receivership, there is no independent third party with authority to marshal, inventory, preserve, and protect the assets remaining in the estate for the benefit of 125 or more investor-victims totaling more than $26 million in unpaid principal.

22. The appointment of an equity receiver under the supervision of this Court is the minimum necessary remedy to protect the interests of plaintiffs and the putative class of PML victims pending resolution of this action. The proposed receiver, Michele Vives of Douglas Wilson Companies, is qualified, independent, and available to serve. Her qualifications are described in Exhibits 1 through 5 to the Motion and in the accompanying Declaration of Michele Vives (Exhibit 3 to the Motion, Declaration Section).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 21st day of April, 2026, at Chicago, Illinois.

*Alexander Loftus*

Alexander N. Loftus
LOFTUS & EISENBERG, LTD.
181 W. Madison Street, Suite 4700
Chicago, Illinois 60602
(312) 899-6625
alex@loftusandeisenberg.com